Joe RIOS, Jr., Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 70983.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 28, 1992.

Rehearing Denied Dec. 9, 1992.

Richard E. Langlois, court appointed, and Royal Griffin, San Antonio, for appellant.

Steven C. Hilbig, Dist. Atty., and Sam Ponder, Lyndee Bordini, and Daniel Thornberry, Asst. Dist. Attys., San Antonio, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of murder of more than one person during the same transaction, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(6).[1] The jury answered special issues affirmatively, and punishment was assessed accordingly at death. Article 37.071, V.A.C.C.P. Appeal to this Court is automatic. *Id.*, § (h).

In his first two points of error appellant challenges the sufficiency of the evidence to show he is responsible for the multiple killings in this cause, and that the killings occurred during the same criminal transaction. The evidence that appellant perpetrated the killings is circumstantial. Appellant does not challenge sufficiency of the evidence at the punishment phase.

The grand jury returned a three count indictment in this cause. The first count alleged appellant intentionally caused the

---

1. § 19.03(a)(6), supra, reads:
   "(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

   \* \* \* \* \* \*

   (6) the person murders more than one person:

   (A) during the same criminal transaction; or
   (B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct."

death of two individuals, Alex Delgado and Robert Torres, during the same criminal transaction. § 19.03(a)(6)(A), *supra.* Count two alleged appellant intentionally caused the deaths of Delgado and Torres, and that during the same scheme or course of conduct he also intentionally caused the death of a third individual, Rosalio Ruiz. § 19.03(a)(6)(B), *supra.* In the third count it is alleged, in addition to what is alleged in the second count, that during the same scheme and course of conduct appellant also intentionally caused the death of a fourth individual, Jorge Rangel. *Id.* All four killings were proven at trial. After all the evidence was presented at the guilt phase, the State elected to proceed on the first count alone. Accordingly, the jury was instructed that in order to convict for the offense of capital murder, it must find appellant intentionally caused the deaths of Delgado and Torres, and that he perpetrated these two killings during the same criminal transaction. The jury was also instructed it could consider extraneous offenses to the extent they have a bearing on the issues of identity and intent. Appellant maintains the evidence fails to establish he committed the killings, or that they were committed during a single criminal transaction. The facts, viewed in the light most favorable to the jury's verdict, are as follows.

The bodies of Delgado and Ruiz were discovered close together on the grounds of St. John's Lutheran Cemetery in San Antonio at about 7:30 a.m. on August 17, 1987. According to the medical examiner, by that time they had been dead at least 24 hours. Delgado had been shot once in the head with a .22 caliber weapon. Torres had been shot three times in the head with a weapon of the same caliber. Each man's pockets had been turned out. Torres' zipper was open and his pants partially pulled down. Two spent .22 caliber shell casings were found at the scene. Both men had last been seen alive in the company of

appellant sometime after 11:30 p.m. on the night of August 15, 1987, in a white van appellant had borrowed from his girlfriend's father. Earlier that evening appellant was seen handling a small caliber automatic pistol, and had fired at least one round out of the window as he was driving the van. A .22 caliber shell casing was later discovered on the floorboard beneath the driver's seat in the van.

The firearms examiner testified that, although he could not "positively say," it was his opinion, judging from a rare rifling pattern present on all of the four bullets recovered from the bodies of Delgado and Torres, that each had been fired from the same gun. That gun, he opined, was a Tanfoglio GT22 or FIE E22.[2] He was able positively to say that the three spent shell casings were all fired from the same weapon, also a Tanfoglio.[3]

On the morning of August 23, 1987, the body of Rosalio Ruiz was discovered just outside the grounds of the Alamo Lodge Masonic Cemetery, near St. John's Lutheran Cemetery. Ruiz had been shot twice in the head with a .22 caliber pistol. Abrasions on the body indicated it had been dragged. His pockets were turned out and his pants "pulled down slightly." Within the grounds of the cemetery was a 1974 Oldsmobile Toronado with a recent bullet hole through the windshield. Appellant's fingerprints were lifted from outside of the driver's side door of the Toronado, and from the roof on the driver's side. One spent shell casing was discovered inside the car. Another was found on the cemetery grounds. The firearms examiner testified that these shell casings had been fired from the same .22 caliber Tanfoglio that had fired the shell casings discovered at the St. John's Lutheran Cemetery and in the white van. He also opined that the bullets retrieved from Ruiz' brain were fired from the same weapon that had killed Torres.[4]

---

**2.** He testified that the GT22 and FIE E22 are "the same gun, just marked differently."

**3.** The actual murder weapon was never recovered.

**4.** The firearms examiner was not asked specifically whether the bullets that killed Ruiz emanated from the same gun as did the bullets that killed Delgado. He did testify, however, that in his opinion the slugs that killed Delgado were

The night before, on August 22, 1987, in a neighborhood near the cemeteries, appellant had waved around a small automatic pistol, and pointed it at the forehead of an eighteen year old boy. A short distance down the street appellant was again seen playing with the gun, and he pointed it at one other person. Sometime after 10:00 p.m. he was seen to get in the front passenger side of a car driven by Ruiz. Appellant had been arguing with Ruiz, and pointing the gun at him as well. The car looked like the Toronado found the next morning at the Alamo Lodge Masonic Cemetery.[5]

The body of Jorge Rangel was found about 2:00 a.m. on August 24, 1987, in the parking lot of Pitman–Sullivan park, in the same general neighborhood. His pockets had been turned out, his pants were unzipped, and his shirt was pulled up. He had been shot once in the neck and once in the temple, and had been dead less than four hours when found. There was blood on his pants, a circumstance consistent with his having been sitting up when shot. A .22 caliber bullet was recovered from his brain. The firearms examiner concluded this bullet was fired from the same Tanfoglio used to kill Delgado, Torres and Ruiz.

Appellant was arrested on August 26, 1987, shortly after leaving his mother's residence at 1223 Virginia in a green and white Plymouth Satellite. In the Satellite police found two live .22 caliber rounds, a spent slug, and a spent shell casing. Both the slug and the shell casing were fired from the same Tanfoglio as were all the others. The slug contained traces of human blood. A quantity of blood was discovered on the front passenger side of the car. The specific blood characteristics, shared by only three percent of the population, proved consistent with Rangel's blood.

Finally, appellant's ex-wife testified that in July of 1987, appellant was living at the residence at 1223 Virginia, close to where each of the bodies was later recovered. Toward the end of July she went there to visit appellant, and an argument ensued. In the course of the argument appellant pointed a small automatic pistol at her, and fired a round into the wall. Police later removed a bullet from the wall, and the firearms examiner concluded that it was fired from the same Tanfoglio later used in all four killings.

■ Every circumstantial evidence case must be tested by its own facts to determine the sufficiency of the evidence. *Brasfield v. State*, 600 S.W.2d 288, at 293 (Tex.Cr.App.1980) (Opinion on original submission). Given the above facts the jury could rationally conclude appellant intentionally caused the deaths of Delgado and Torres. The same weapon was used to perpetrate all four murders. That murder weapon was shown to have been in appellant's possession several weeks prior to the killings. Appellant was seen with Delgado and Torres, brandishing a small caliber pistol, within hours of their having been found dead. He was shown to have been threatening others with a small caliber pistol on the night he met up with Ruiz, shortly before Ruiz was killed. A bullet and shell casing fired from the murder weapon were found in the car appellant was driving when arrested, and blood consistent with Rangel's was found on the passenger seat. All the bodies were left in the same general vicinity, close to appellant's home, three out of four in or just beyond cemetery grounds. All had been shot in the head. Each had had his pockets turned out and three of the four had had their clothing tampered with in a peculiar fashion. Together these facts support the conclusion that the same person perpetrated all four killings, and that appellant was that person. The evidence admits of no other reasonable hypothesis. We hold the evidence is sufficient to show appellant killed Delgado and Torres. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

fired from the same gun as those that killed Torres. See text, *ante.*

5. The Toronado belonged to Ruiz' friend, Robert Blunt. Intoxicated, Ruiz had taken the Toro-nado without permission a short time before appellant was seen to get into a similar car that Ruiz was driving.

■ We conclude also that the evidence was sufficient to support a jury finding that appellant killed Delgado and Torres "during the same criminal transaction." § 19.03(a)(6)(A), supra. The Legislature did not define "criminal transaction." The trial court did not define it in the jury charge. Thus, the jury was left to common acceptation. The dictionary defines a transaction as "an act, process, or instance of transacting." Webster's Ninth New Collegiate Dictionary (1988), at 1252. "Transact," in turn, is a transitive verb meaning "to carry out: PERFORM; *esp:* to carry on." *Id.* Thus, in common acceptation, a criminal transaction must be understood as an act, process, or instance of carrying on or carrying out crime.

"Criminal transaction" is different, however, from "scheme or course of conduct" under § 19.03(a)(6)(B), supra. In fact, under the statute the two are mutually exclusive. As § 19.03(a)(6)(B) is drafted, one cannot be convicted of murdering more than one person in the course of the same scheme or course of conduct unless there is also proof the murders occurred during different criminal transactions. Therefore, we know the Legislature must have intended "same criminal transaction" to amount to something less than "same scheme or course of conduct." We also know, however, that "same criminal transaction" cannot be limited to conduct that violates only one statute only one time, for it takes the murder of "more than one person" under V.T.C.A. Penal Code, § 19.02 to constitute capital murder *at all*, under § 19.-03(a)(6)(A), supra. Accordingly, we must presume the jury construed "criminal transaction" in this context to mean something like an act, process (not amounting to same scheme or course of conduct), or instance of carrying on or carrying out murder of more than one person.

Moreover, what apparently separates a "process ... of carrying on or carrying out" multiple murders, under § 19.-03(a)(6)(A), supra, from a "scheme or course of conduct" during which multiple murders are committed, under § 19.-03(a)(6)(B), supra, is the continuity of the killing. In *Vuong v. State,* 830 S.W.2d

929, at 941 (Tex.Cr.App.1992), we construed "criminal transaction" to embrace facts showing "a continuous and uninterrupted chain of conduct occurring over a very short period of time ... in a rapid sequence of unbroken events." Understanding "criminal transaction" in this narrowest sense, we were able to say that the statute was not unconstitutionally vague as applied to Vuong, who had proceeded methodically through a pool hall and cafe shooting people one after the other. In another context we have said that "transaction may be understood to be an uninterrupted and continuous sequence of events or assaultive acts." *Rubino v. Lynaugh,* 770 S.W.2d 802, at 804 (Tex.Cr.App.1989) (internal quotes omitted) (carving doctrine). And in construing "transaction" in another statutory context, we have observed that a "criminal transaction terminates with cessation of conduct—ordinarily in a relatively brief period of time." *Kalish v. State,* 662 S.W.2d 595, at 600 (Tex.Cr.App.1983) (Article 28.061, V.A.C.C.P., now defunct). In reviewing sufficiency of the evidence to show "same criminal transaction," therefore, we will look to see whether the jury could rationally conclude appellant engaged in a continuous and uninterrupted process, over a short period of time, of carrying on or carrying out murder of more than one person.

■ Delgado and Torres were last seen alive about 11:30 p.m. on the night of August 15, 1987, in appellant's company. They were killed sometime over the course of the next eight hours, for the medical examiner concluded they were dead by at least 7:30 the next morning. They were shot in the same manner, with the same weapon, and their bodies were deposited only a few feet apart on the cemetery grounds. Neither man had been acquainted with appellant prior to the night of their deaths. Although circumstantial, the evidence suggests no realistic scenario but that appellant carried out the murders of Delgado and Torres in a continuous and uninterrupted process over a short period of time. We hold the evidence is sufficient to convince a rational jury beyond a reason-

able doubt that appellant murdered Delgado and Torres during the same criminal transaction. Appellant's first and second points of error are overruled.

■ By way of four points of error appellant contends the trial court erred in failing to submit at the punishment phase of trial an instruction sufficient to equip the jury to exercise its "reasoned moral response" to, *inter alia,* evidence of his mental retardation. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Appellant requested specific instructions, recounted *post.* Therefore, although this case was tried after the date of decision in *Penry,* error is preserved. *Cf. Black v. State,* 816 S.W.2d 350 (Tex.Cr. App.1991) (Campbell, J., concurring, joined by five other judges).

■ Appellant presented some evidence of a disadvantaged background, but, measured against this Court's recent caselaw, it is not of significant mitigating value. See, e.g., *Draughon v. State,* 831 S.W.2d 331, at 339 (Tex.Cr.App.1992). However, appellant also presented, and the State did not refute, testimony from two witnesses to the effect that appellant tested in the mildly retarded range. Dr. James O. Sherman, a psychologist, testified he had examined appellant in 1982, five years prior to the offense on trial. Sherman administered the Wechsler Adult Intelligent Scale, revised, to determine that appellant had an I.Q. of 66. He characterized appellant as within the range of the mildly retarded, functioning at the level of a second or third grader. Twice before, in 1979 and 1980, appellant had been evaluated as mentally retarded, with I.Q. scores of 55 and 59, respectively. Despite this apparent improvement between 1979 and 1982, Sherman testified that I.Q. "tends to remain relatively constant over time." He therefore "assume[d]" appellant's I.Q. "would be relatively the same" as of the time of trial, *viz:* within the mildly mentally retarded range.

Patrick Hopkins, the Residential Services Coordinator for the Bexar County Mental Health and Mental Retardation Center, with eleven years of experience working with the mentally retarded, also tested appellant in 1982. Appellant was deemed to have an I.Q. of 67 on the Leiter International Performance Scale, with a mental age of between eight and nine years old. This level of intelligence generally does not increase significantly as a person achieves adulthood. Like Dr. Sherman, Hopkins testified that one's level of intelligence "should be a relatively stable factor throughout one's life[.]" Specifically as to appellant he stated, "I haven't seen any additional testing or any additional information that would lead me to believe that [appellant's I.Q.] has changed or that it would change." Hopkins concluded appellant "was mildly mentally retarded, ... and that he had a specific developmental reading disorder." There was other testimony appellant was illiterate, had a speech impediment, and "didn't really have a concept of money."

Under *Ex parte Goodman,* 816 S.W.2d 383 (Tex.Cr.App.1991), *Ramirez v. State,* 815 S.W.2d 636 (Tex.Cr.App.1991), *Ex parte McGee,* 817 S.W.2d 77 (Tex.Cr.App. 1991), and *Ex parte Williams,* 833 S.W.2d 150 (Tex.Cr.App.1992), appellant was unquestionably entitled to an instruction empowering the jury to assess a penalty less than death, notwithstanding affirmative answers to the special issues, as a "reasoned moral response" to the fact of his mental retardation. The only remaining question is whether the trial judge gave a sufficient instruction in this post-*Penry* case. In our view he did not.

■ Appellant requested the trial court to submit a number of instructions to the jury at the conclusion of evidence at the punishment phase of trial. His first requested instruction reads:

"You are instructed that any evidence which, in your opinion, mitigates against the imposition of the Death Penalty, including any aspect of the defendant's reputation, character, or record, any of the circumstances of the commission of the offense which have been admitted in evidence before you, may be sufficient to cause you to have a reasonable doubt as to whether or not the true answer to any

of the Special Issues is 'Yes'; and in the event such evidence does so cause you to have such a reasonable doubt, you should answer the Issue 'No.'"

The trial court did in fact give this instruction to the jury. Appellant requested an additional instruction by which the jury would have been able expressly to indicate, in answer to a fourth special issue, whether "the mitigating circumstances of Defendant's mental retardation should result in a sentence of life." Although appellant's requested instruction number twenty, reproduced in the margin, is not a model, it was sufficient to alert the trial court to appellant's wish to have the jury make explicit its reasoned moral response to the fact of his mental retardation.[6] Believing that appellant's first requested instruction was sufficient to protect appellant's Eighth Amendment rights under *Penry*, the trial court refused this further instruction.[7]

The instruction the trial court gave is not sufficient, by itself, to apprise jurors that they could direct imposition of a life sentence irrespective of how they believed the evidence showed the special issues ought to be answered beyond a reasonable doubt. It seems to be a clumsy attempt at jury nullification; instructing that "any evidence which ... mitigates against the imposition of the Death Penalty ... may be sufficient to cause you to have a reasonable doubt as to whether or not the true answer to any of the Special Issues is 'Yes'...." What this does *not* clearly communicate is that evidence that has no rational bearing whatsoever on special issues, or has only a tendency to militate in favor of affirmative answers, may nevertheless, if it has an independent mitigating impact, serve as the basis for answering one or more of the special issues "no," in spite of the jurors' oaths to answer special issues honestly, and in accordance with what they believe the *relevant* evidence shows. It does *not* do enough to explain to jurors that they may, should they find it appropriate in their reasoned moral judgment: 1) use the fact of appellant's mental

---

**6.** Appellant's requested instruction number twenty reads:

"1. When you deliberate about the questions posed in the Special Issues, you must consider any mitigating circumstances supported by the evidence presented in both phases of the trial. In this case, there was presented to you evidence that the Defendant was mentally retarded. You may consider such evidence as a mitigating circumstance in deciding the answers to the Special Issues.

2. A mitigating circumstance is any aspect of the defendant's character and record or the circumstances of the crime which, in fairness or mercy, calls for a sentence less than death.

3. You may deliberate as a body about mitigating circumstances but, you are not required to reach an unanimous verdict as to it's [sic] existence or weight.

You are instructed that when you vote about whether mitigating circumstances exist and, if so, how much weight they deserve, you may vote 'yes' if ten or more jurors believe that the mitigating circumstances exist or if ten or more jurors have a reasonable doubt that they exist.

You are further instructed that when you vote about whether mitigating circumstances should result in a sentence of life you may vote 'yes' if ten or more jurors believe that the mitigating circumstances required a sentence of life or if ten or more jurors have a reasonable doubt thereof.

4. We the jury find that the evidence of Defendant's mental retardation is a mitigating circumstance.

___ YES ___ NO

5. If you decide that the evidence of Defendant's mental retardation is a mitigating circumstance, you must not give it an aggravating effect.

6. Thus, if in your judgment, the evidence of Defendant's mental retardation independently calls for a life sentence even though the evidence also tends to support a 'yes' answer to either Special Issue # 1 or Special Issue # 2, you must not answer the following Issue 'no,' but rather you either answer it 'yes.' or you may use it as a basis for a vote for mercy and write the word 'life' in your verdict form.

7. We the jury find that the mitigating circumstances of Defendant's mental retardation should result in a sentence of life.

___ YES ___ NO"

**7.** The trial court also refused appellant's eleventh requested instruction. This requested instruction, not expressly tailored to mental retardation, is of the jury nullification variety, authorizing the jury to answer one of the special issues "no," "if in your judgment, a mitigating circumstance independently calls for a life sentence even though it also tends to support a 'yes' answer to a Special Issue...." The trial judge also refused this instruction on the basis that he had already granted appellant's first requested instruction.

retardation as a reason to answer the first special issue "no" even if they do not find it prevented him from acting "deliberately"; or, 2) use that fact not only to answer the future dangerousness question "yes," but also, paradoxically, to answer it "no" instead. In short, it simply does not adequately inform the jury that it may assess a punishment less than death on account of appellant's mental retardation, irrespective of what the evidence shows as to deliberateness and future dangerousness. *Gribble v. State*, 808 S.W.2d 65, at 75 (Tex.Cr. App.1990).

In *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the defendant complained that a jury charge in a capital punishment proceeding violated his Eighth Amendment rights. The charge instructed the jury that it could consider as a mitigating factor, pursuant to a subsequently amended California statute, *inter alia*, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Boyde complained that this instruction might be read so as to preclude jurors from considering evidence of his background and character unrelated to the circumstances of the crime itself. The United States Supreme Court announced:

> "The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."

*Id.*, at 380, 110 S.Ct. at 1198, 108 L.Ed.2d at 329. In *Boyde* the Court found there was not such a reasonable likelihood. First, the Court did not believe a jury would read the above instruction to preclude background and character evidence, reasoning that background and character may be understood to be "circumstances which extenuate[ ] the gravity of the crime." Moreover, even if the language might be susceptible to the interpretation Boyde complained of, the Court believed it unlikely the jury would have opted for that construction. The California capital punishment scheme

requires the jury to balance statutory aggravating factors against mitigating factors, including but not limited to those statutorily identified. Many of the statutorily enumerated mitigating factors have nothing to do with the offense on trial. Much of the punishment evidence presented to the jury in mitigation was in the nature of background and character evidence not directly related to the crime. The jury would not likely have believed that evidence was needlessly admitted. Moreover, the prosecutor argued not that such evidence had no relevance to the jury's balancing task, but simply that appellant's background and character evidence had little *weight*. Under these circumstances the Supreme Court could not conclude there was a reasonable likelihood the jury would understand the instructions to preclude consideration of that evidence.

In our view there was a reasonable likelihood that the jury in this case failed to understand that it was entitled to measure evidence of appellant's mental retardation for whatever mitigating weight it may have apart from the special issues. Unlike the California capital punishment scheme, former Article 37.071, supra, does not expressly accommodate mitigating evidence apart from its relevance to the special issues. Without more explanation, an instruction that baldly tells the jury it may consider evidence to be mitigating that seems either altogether irrelevant to the special issues, or relevant only in an aggravating sense, is likely in the context of our scheme to confound rather than inform. That counsel for appellant framed his entire final argument at punishment, albeit brief, in terms of the mitigating impact of appellant's retardation can only have served to compound the confusion. Without clearer guidance it seems likely the jury would limit its consideration of appellant's mental retardation to whatever tendency it had to disprove deliberateness or to prove future dangerousness. Under *Penry* appellant was entitled to more.

We hold the instruction given in this cause did not adequately protect appellant's Eighth Amendment rights. Accord-

ingly, we reverse the judgment of the trial court and remand the cause.[8]

---

**8.** The Legislature amended Article 44.29(c), V.A.C.C.P., in 1991 to provide that error committed only in the punishment phase of a capital murder prosecution will not result in a whole new trial, as before, but only in a new punishment proceeding. See Acts 1991, 72nd Leg., ch. 838, p. 2900, § 1, eff. Sept. 1, 1991. However, the Legislature expressly made this amendment prospective only. *Id.*, § 5. For this reason we need not address points of error alleging trial error in the guilt/innocence phase of trial.