**Opinion filed January 14, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00007-CR

_____

## JACOB R. GROENING, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**

**Gaines County, Texas**

**Trial Court Cause No. 17-4718**

### M E M O R A N D U M   O P I N I O N

Appellant, Jacob R. Groening, was indicted for capital murder for the murder of two victims, Ernest Shelton and Patricia Marquez, committed in the same criminal transaction. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (West Supp. 2020). The jury convicted Appellant of the charged offense and assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal

Justice. In a single issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. We affirm.

*Background Facts*

Appellant is married to Tiffany Groening, and they have four children together. Appellant had no criminal history of violence against Tiffany. On March 4, 2017, Tiffany and Appellant hosted a barbecue at their house with Tiffany's mother, Patricia Marquez, and grandmother, Nellie Marquez. Appellant testified that he had a good relationship with Patricia, in general, and that he and she got along fine during the barbecue. Tiffany and Appellant both testified that Appellant drank a twelve-pack of beer during the barbecue.

Afterwards, the four went to Perika's, a bar and restaurant located approximately three miles away, for a drink. Tiffany drove Appellant in their pickup, and Patricia and Nellie followed in Patricia's car. Appellant testified that, while at Perika's, Tiffany drank one tequila shot and that he drank at least eight tequila shots. At some point during this time, Patricia and Nellie left, but Tiffany and Appellant remained at Perika's.

Tiffany and Appellant got into an argument when Tiffany turned down Appellant's offer to have another drink. Appellant began cursing at Tiffany and calling her names. Tiffany walked out to the back patio of Perika's to smoke a cigarette. Appellant followed her and told her that, if she left him there that night, he would kill her.

Appellant was standing in the parking lot just off the patio of Perika's yelling at Tiffany when Mike Diaz, the owner of Perika's, approached Appellant and barred him from returning to the establishment. Appellant angrily told Diaz that Diaz would be a dead man by the next day. Appellant repeated this threat several times. Diaz asked Tiffany if she wanted to leave with Appellant; she replied that she did not. Appellant ran to the pickup in which he and Tiffany had arrived, but Tiffany

2

had the keys and she refused to unlock the pickup. Appellant eventually left the area on foot. Tiffany paid their tab and called Patricia to come pick her up. Tiffany testified that she was shaken up from the incident and that she did not want to drive herself home. Patricia arrived at Perika's driving her small white sedan, and Patricia drove Tiffany home to Tiffany and Appellant's house.

After leaving Perika's on foot, Appellant walked to the nearby Stripes gas station and asked Joshua Hansen, who was parked in the Stripes parking lot, for a ride home. Appellant and Hansen had never met before, but Hansen agreed. During the drive, Appellant told Hansen that Appellant had had a fight with his wife, that his wife could "kiss [his] ass," and that there was someone back at the bar that Appellant wanted to hurt. Hansen suggested that Appellant should go home and sleep it off and that Appellant could go to jail if he hurt someone. Appellant said that he had been to jail before and was not scared to go back.

Hansen dropped Appellant off on the roadside near Appellant's home. Hansen offered to drive Appellant all the way to his driveway, but Appellant refused, saying that he did not want Hansen to get "any more involved in this." As Hansen was pulling away, he noticed a white suburban parked in the driveway of Appellant's house.

Appellant testified that, from the time Hansen dropped him off until the next day, he was completely blacked out and remembers nothing from the rest of the night. Appellant testified that, after Hansen dropped him off, he blacked out and threw up and that he woke up on the ground somewhere covered in grass burs. Appellant repeatedly testified that he did not shoot anyone and that he did not recall any of the night's events after this time.

Hansen returned to the Stripes, but he testified that soon afterwards a "really bad feeling hit [him] and [he] thought just something [was] not right about this night, about what's going on here." Leaving the Stripes, Hansen began driving back in the

direction of Appellant's house. As he neared the house, Hansen saw a white suburban driving past him in the direction of town, moving extremely fast. According to testimony by Gaines County deputies, the distance between Perika's and Appellant's house could be traveled in three or four minutes if someone were driving at a high rate of speed.

Hansen testified that, after seeing the suburban, he became even more curious, and he pulled onto a county road off the highway and parked where he had a view of Appellant's house. He then noticed that there was a little white sedan parked at the house.

About twenty to twenty-five minutes after Appellant had left Perika's on foot, Diaz, his wife Anna Diaz, and a patron named Ernest Shelton were sitting out on the back patio at Perika's when they saw a white suburban pull up in the parking lot. Appellant exited the vehicle yelling Diaz's name.

Shelton was the first to reach Appellant; he was running at Appellant with his hands outstretched, and Diaz was a step or two behind Shelton. Appellant shot Shelton in the head. Appellant turned the gun on Diaz, and Diaz hit Appellant's arm or hand. Appellant then fired a shot, hitting Diaz in the groin. Appellant fired another shot, hitting Diaz in the back. Appellant got on top of Diaz and tried to put the gun up against Diaz's head. After a brief struggle, Appellant got off Diaz, returned to the white suburban, and drove off.

Anna Diaz had called 9-1-1 when Appellant first arrived back at Perika's. The call went to the Gaines County Sheriff's Office, where dispatcher Crystal Estrada heard each gunshot over the phone. The shots were recorded on the 9-1-1 call, which showed that the shots occurred at 11:41 p.m., within seconds of each other. Gaines County deputies arrived at Perika's at 11:42 p.m., but Appellant had left the scene. Gaines County Sheriff's Deputy Corey Furlow testified that he was still at the

4

murder scene at Perika's when, at 11:53 p.m. or 11:54 p.m., a call came over police communications that a second shooting had occurred nearby.

When Tiffany and Patricia arrived back at Tiffany and Appellant's house from Perika's, they observed that Tiffany's white suburban was gone. Tiffany called Appellant to tell him that the suburban was gone. Appellant called Tiffany various names during the call. Tiffany testified that she started to get a "creepy feeling" and asked Patricia to pull the car out of the driveway and park on the side of the road near the mailboxes. Tiffany then saw Appellant arrive at the house in the white suburban and park in the garage. She saw Appellant get out and walk around for a little while. He then called her again, and as she spoke with him on the phone, he continued to call her names. Then, Appellant got back into the suburban, backed out of the drive extremely fast, and pulled up next to Patricia's car.

Appellant exited the suburban and immediately began shooting into Patricia's car at Tiffany and Patricia. At trial, Tiffany testified that she was able to identify the gun Appellant used as an M&P .22 that Tiffany had purchased at Cabela's in Lubbock.

Tiffany testified that Appellant fired shots into the car until his gun was empty. Tiffany looked over at Patricia and saw that Patricia's head was hanging down on her chest and blood was dripping off Patricia's nose. Appellant had shot Patricia in the head and in the neck. Tiffany yelled at Appellant that he had "just killed somebody," to which he replied that he did not care. While Appellant was reloading his gun, Tiffany climbed out of the sedan. She then ran to the white suburban, got in it, and drove off.

Hansen, who had witnessed the shooting from his parked car, called 9-1-1 at 11:54 p.m. Hansen testified that approximately ten minutes had passed between the time he first saw the suburban driving back to town to the time he saw the suburban return to the house and pull up next to the white sedan.

5

At 11:54 p.m., Tiffany arrived at the Gaines County Sheriff's Office in the white suburban. She was covered in blood. Tiffany told deputies that her husband had just shot her mother. Tiffany had also been shot and was bleeding; the tip of her finger had been shot off. Tiffany was transported to the hospital and survived her wounds.

Gaines County sheriff's deputies went to Tiffany and Appellant's house, where they discovered Patricia. Patricia was transported to the hospital, where doctors eventually pronounced her dead from her gunshot wounds. At Perika's, Shelton and Diaz were also transported to the hospital, where Shelton was eventually pronounced dead. Diaz survived and eventually recovered from his wounds. Gaines County deputies apprehended Appellant the next morning.

*Analysis*

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

When conducting a sufficiency review, we consider all of the evidence admitted at trial and defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393

6

S.W.3d 763, 767–68 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 722, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778.

Section 19.03(a)(7)(A) provides that a person commits capital murder if he intentionally or knowingly causes the death of more than one person during the same criminal transaction. PENAL § 19.03(a)(7)(A). The legislature did not define the term "same criminal transaction" as used in the capital murder statute. *Jackson v. State*, 17 S.W.3d 664, 669 (Tex. Crim. App. 2000); *Coble v. State*, 871 S.W.2d 192, 197 (Tex. Crim. App. 1993). The Court of Criminal Appeals has interpreted the phrase to mean "a continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in a rapid sequence of unbroken events." *Jackson*, 17 S.W.3d at 669 (alteration in original) (quoting *Rios v. State*, 846 S.W.2d 310, 311–12 (Tex. Crim. App. 1992); *Vuong v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992)); *accord Heiselbetz v. State*, 906 S.W.2d 500, 506 (Tex. Crim. App. 1995). When reviewing the sufficiency of the evidence to show "same criminal transaction," we look to see whether "the jury could rationally conclude appellant engaged in a continuous and uninterrupted process, over a short period of time, of carrying on or carrying out murder of more than one person." *Jackson*, 17 S.W.3d at 669 (quoting *Rios*, 846 S.W.2d at 314); *Coble*, 871 S.W.2d at 198–99.

Appellant asserts that the evidence is insufficient to show that both murders occurred in the same criminal transaction. Specifically, Appellant contends that the murders in this case were two separate and distinct criminal transactions because there was no evidence that Appellant planned to kill Patricia nor was there evidence of any connection between Shelton and Patricia.

As noted by the State, the focus of Section 19.03(a)(7)(A) is the continuity of the killings, not whether the killings were each part of a common plan. *See Rios*, 846 S.W.2d at 314 ("[W]e know the Legislature must have intended 'same criminal transaction' to amount to something less than 'same scheme or course of conduct.'"). In this regard, multiple killings pursuant to a common scheme or plan is a separate offense under Section 19.03(a)(7)(B). *Compare* Penal § 19.03(a)(7)(A), *with* § 19.03(a)(7)(B).

*Coble* is instructive in addressing the question of whether the evidence is sufficient to prove that Patricia's murder occurred in the "same criminal transaction" as Shelton's murder.[1]  871 S.W.2d at 192.  There, the appellant murdered three victims—the parents and brother of his estranged wife—over the course of an afternoon; the first murder occurred between 2:00 p.m. and 3:30 p.m., the second between 4:15 p.m. and 5:30 p.m., and the third shortly after 5:30 p.m. *Id.* at 198. The victims all lived on the same street. *Id.* at 198. The appellant first murdered his father-in-law in the parents' house. *Id.* He then murdered the brother in the brother's garage, located a "short distance down the road" from the parents' house. *Id.* at 195, 198. The appellant then murdered his mother-in-law, approximately three and a half hours after the first murder, in the parents' garage. *Id.* at 198. Between each murder, the appellant returned to his wife's house, where he had handcuffed and restrained her children, awaiting the arrival of each of his next victims for "less than one hour between each murder." *Id.*

The Court of Criminal Appeals held:

Given that the three murders occurred in close proximity to each other, on the same road, within a few hours of each other, in a continuous and uninterrupted series of events, a jury could have *rationally* concluded

---

[1]Both parties' briefs focused on the facts in *Coble*.  We agree that *Coble* is a helpful guide in examining the facts before us.

8

beyond a reasonable doubt that [the] appellant murdered [his wife's] father, brother, and mother during the "same criminal transaction."

*Id.* at 199. In an accompanying footnote, the court, relying on the legislative history of the "same criminal transaction" provision,[2] characterized the provision as "intended for mass murders, e.g., 'bombs a car killing several people or kills six people in a row at a bar.'" *Id.* at 199 n.10 (citing *Corwin v. State*, 870 S.W.2d 23, 28, n.5 (Tex. Crim. App. 1993)). The court stated that "[a]lthough appellant's actions do not fit within . . . the *typical* mass murder . . . scenarios, his actions are more analogous to a mass murder . . . ." *Id.* at 199 n.10.

In this case, Appellant murdered two people in the span of thirteen minutes, and the murder scenes were three miles apart. Appellant committed these murders immediately following the incident at Perika's in which he threatened to kill Tiffany and Mike Diaz. Twenty to twenty-five minutes after leaving Perika's on foot, Appellant pulled into the Perika's parking lot in his white suburban, exited his vehicle while calling out Diaz's name, and then shot and killed his first victim, Shelton, at 11:41 p.m. Appellant quickly left, before police arrived at 11:42 p.m. Appellant contends that this concluded the criminal transaction of killing Shelton.

Upon departing Perika's, Appellant immediately returned to his house, where Patricia and Tiffany were located. While on the way back to Appellant and Tiffany's house, Appellant was on the phone with Tiffany, who, with Patricia, was sitting in Patricia's car outside the house. Arriving within approximately three or four minutes of his departure from the scene of his first murder, Appellant immediately exited his vehicle and began shooting into Patricia's car. Appellant's shots struck Patricia in the head and neck, killing her, and struck Tiffany in her finger. As Appellant was reloading his weapon, Tiffany escaped Patricia's car, got into Appellant's suburban,

---

[2]At the time, the provision was codified as Section 19.03(a)(6)(A). *See Coble*, 871 S.W.2d at 199 & n.10.

and drove herself to the Gaines County Sheriff's Office, arriving at 11:54 p.m., thirteen minutes from the time that Appellant fired the first shots at Perika's. Appellant urges that the State has not proved any motive or plan by Appellant to harm Patricia, with whom he claims he had a good relationship. But motive and plan are not required to be proved in the charged offense under Section 19.03(a)(7)(A).

Given that the two murders occurred within relatively close proximity to each other—three miles apart, within thirteen minutes of each other, and in a continuous and uninterrupted series of events, a jury could have rationally concluded beyond a reasonable doubt that Appellant murdered Shelton and Patricia during the "same criminal transaction." *See Coble*, 871 S.W.2d at 199 & n.10. We overrule Appellant's sole issue.

### This Court's Ruling

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

January 14, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Wright, S.C.J.[3]

Williams, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.