**Billie Wayne COBLE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 71084.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 3, 1993.

Rehearing Denied Jan. 26, 1994.

Hoagie L. Karels, Waco, for appellant.

John W. Segrest, Dist. Atty., Juanita Fielden, Asst. Dist. Atty., Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MALONEY, Judge.

A jury convicted appellant of capital murder for intentionally causing the death of three individuals during the same criminal transaction. *See* TEX.PENAL CODE ANN. § 19.03(a)(6)(A) (Vernon 1989). The jury affirmatively answered the submitted issues prescribed by article 37.071(b) and the trial court assessed punishment at death. TEX. CODE CRIM.PROC.ANN. art. 37.071(e) (Vernon 1989). Appeal to this Court is automatic. *Id.* art. 37.071(h). Appellant raises fifteen points of error in this direct appeal. We will affirm.

Karen Vicha lived in Axtell, Texas in a house on the same road as her parents' house and her brother Bobby Vicha's house. Karen's parents lived across the road from Karen and a short distance down the road from Bobby. On August 29, 1989, Karen's parents and brother were murdered; all three died as a result of gunshot wounds.

The evidence established that appellant and Karen married on July 3, 1988; their relationship quickly deteriorated, and appellant moved out of Karen's home in early July

1989. On July 18, 1989, in an effort to convince her not to divorce him, appellant kidnapped Karen at knifepoint.[1] Appellant blamed Karen for that offense and his subsequent arrest.

At 2 p.m. on the day of the instant offense, appellant was seen driving about one-half mile from Karen's parents' house. Appellant's car was seen at 3:15 p.m. that day parked in Karen's parents' driveway. Two of Karen's three daughters came home from school shortly after 3:30 p.m. to find appellant waiting at their house with a gun. He handcuffed the girls and put them in one of the bedrooms.[2] When they asked appellant what he was doing, he replied that he could not explain it, that he hated doing it, but " 'he had already done too much to be forgiven for.' " Later at 4:15 p.m., Karen's youngest daughter came home from school with Bobby's son. Appellant handcuffed and tied them together and put them in the bedroom with the girls. Karen's oldest daughter testified that appellant mentioned that he handcuffed them because he was going to show them what it felt like to be locked up, and because "he was going to go to jail the next day; and if he was going to go, it was going to be for a good reason."

Appellant left after a short time had passed. Karen's oldest daughter testified that she heard appellant cut the telephone lines. Looking out the window, she saw her grandfather's truck parked in Bobby's driveway; the truck door opened, but she could not tell who got out. She saw a lot of movement and then heard two gunshots. She looked out the window again and saw appellant driving towards her house in her grandfather's truck. She testified that when appellant came into the bedroom, he was very shaken and sweaty, and he had blood on his shirt. Appellant left the house again about 5:30 p.m. when he saw Karen's mother drive by; he returned after a short while, and told the children he was waiting for Karen to come home.

When Karen came home shortly before 6 p.m., she saw appellant coming out of one of the bedrooms with a gun. Karen testified that appellant said, " 'Karen, I've killed your momma [sic] and your daddy and your brother, and they are all dead, and nobody is going to come help you now." Appellant showed her his bloody thumb and Bobby's service revolver, and told her Bobby had shot him; appellant also had blood around his legs. Appellant showed Karen her father's pickup truck and $1000 cash that he took from Karen's mother. Bobby's girlfriend arrived at Karen's house and noticed that Karen was handcuffed when she answered the door. Bobby's girlfriend then went to Bobby's house, called Karen's uncle, and told him that Karen was handcuffed.[3]

Karen's uncle called the sheriff's department. The dispatcher testified that she received the call at 6:25 p.m., and dispatched some deputies. Deputy Turnbow testified that when he arrived at Karen's home, two of her daughters informed him that Karen had been kidnapped. Turnbow eventually proceeded to Karen's parents' house, entering through the garage where he found Karen's mother. After determining that she was dead, Turnbow went inside the house and discovered Karen's father who was also deceased.[4] Turnbow attempted to use the tele-

1. While Karen was out with a friend at a bar, appellant hid in the trunk of Karen's car which was parked in the bar's parking lot. Karen headed for home unaware that appellant was in her trunk. On the way home, appellant entered the rear of the car from the trunk by folding down the rearseat. He held a knife to Karen and instructed her to drive to a field where they could talk about their relationship. He released her after a couple hours in the field.

2. A toy store clerk testified that four or five days before the instant offense, appellant purchased metal toy handcuffs.

3. After calling Karen's uncle, Bobby's girlfriend went into the kitchen and saw chairs and plants knocked over, and blood on everything, including the drapes which were torn down.

4. Karen's father was covered in blankets and towels. Another deputy testified that Karen's father had a belt around the towels around his head, his pants were down to his ankles, and his white t-shirt and shirt were pulled up under his armpits indicating he had been dragged to where he was found. Karen's father did not have on any shoes. The officers found a spot down the hall from where Karen's father's body was found where the carpet was soaked with blood. There was also some cleanser in the carpet as if someone had attempted to clean up the blood.

phone, but because the line was cut, he went to Bobby's house. There, he found Bobby's deceased body in his car in the garage. He then called the dispatcher, and reported the triple homicide. At the bottom of Bobby's garage door was a bloody fingerprint which later was determined to match appellant's fingerprint. Three toy handcuff packages were found at Karen's house which Karen testified were not in her house before this incident. The fingerprints on the packages also matched appellant's fingerprints.

Shortly after Bobby's girlfriend left Karen's house, appellant and Karen also left with appellant driving Karen's car while Karen sat in the passenger seat handcuffed. After beating her,[5] appellant eventually drove to a pasture where they stayed until dark. Appellant told Karen that her brother had put up a fight before he killed him.[6] Appellant also said that he had to carry her father who was hard to kill, and that he " 'really hated to do that to your mom. But when she found out about your dad, she just went crazy.' "

Shortly after leaving the field, they passed a sheriff's car which followed them. Appellant crashed Karen's car into a parked car resulting in injuries to both appellant and Karen. After the collision, while searching appellant, police officers found several items in appellant's pockets, including Karen's father's watch and wallet, as well as .357 caliber and .38 caliber bullet casings. Officers also retrieved a .38 caliber revolver, a Smith and Wesson .357 magnum revolver, and a box of .38 caliber bullets from the car. The evidence showed that the .357 revolver found in the car had fired the .357 bullet casings found in appellant's pocket and three bullet fragments which were found in Bobby's car.[7] At the emergency room where appellant was taken for treatment, appellant spontaneously told hospital personnel and police officers that he had killed three people. One of the police officers present had taped the admission which was played for the jury at trial.

I.

◼ A person commits a capital offense if he intentionally or knowingly causes the death of more than one person either "during the same criminal transaction" or "during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." TEX.PENAL CODE ANN. § 19.03(a)(6)(A) & (B). In his fifth point of error, appellant contends the evidence is insufficient to prove that the three murders occurred during the "same criminal transaction." *Id.* § 19.03(a)(6)(A).[8]

The legislature did not define the term "same criminal transaction" as used in the capital murder statute, and the trial court in this case did not provide a definition in its charge. Appellant argues that the term involves a "continuity of time and place." He

---

5. Karen managed to get one of her hands out of the handcuffs and grabbed the steering wheel causing the car to go into a ditch near Wal–Mart. She and appellant fought; he pistol whipped her, beat her with his fists, and choked her until she could not breathe.

6. Karen testified as follows:

> [Prosecutor]: What, if anything, did [appellant] tell you about killing your brother [Bobby]?
> [Karen]: Well, he started telling me how tough I was. He said, "You're pretty tough. You can really fight."
> He said, "You know, your brother thought he was tough too." He said, "He put up one hell of a fight." He said, "I chased him down the road one way, and I chased him back. And then I shot him, and he was going for the gun in his car. And he wouldn't die." "So," he said, "finally I had to blow a hole that big in his neck."
> [Prosecutor]: Did [appellant] say anything about cops and how tough they are?

> [Karen]: He said, "He thought he was tough because he was a cop." "But," he said, "all cops think they are tough, but he wasn't that tough."
> He said right before he died Bobby said there would [sic] all he was trying to do was keep you away from my sister.

7. One bullet fragment was found in the carpet of Bobby's car, another in the passenger seat, and the third in the floor of the driver's seat. A firearms expert testified that he could not determine whether the .38 caliber revolver fired any of the bullets found at the crime scene, although it was a possibility. He also testified that the two bullets removed from Karen's father's head were Smith and Wesson .38 caliber.

8. The grand jury did *not* indict appellant for murdering more than one person "during different criminal transactions but ... pursuant to the same scheme or course of conduct." TEX.PENAL CODE ANN. § 19.03(a)(6)(B).

provides the example of "a gunman walking into a bar and firing a gun and killing more than one person before leaving the premises." The State argues that "same criminal transaction" involves a "common purpose" and "continuity of action." [9] Appellant responds that defining same criminal transaction as involving a common purpose, as the State suggests, negates the need for section 19.03(a)(6)(B) ("same scheme or course of conduct").

In *Vuong v. State*, 830 S.W.2d 929 (Tex. Crim.App.), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992), this Court rejected a claim that the term "same criminal transaction" as used in section 19.03(a)(6)(A) was vague as applied to that appellant. This Court emphasized that the killings were a result of "a continuous and uninterrupted chain of conduct occurring over a very short period of time[,]" and that "both killings occurred in a rapid sequence of unbroken events." *Vuong,* 830 S.W.2d at 941. We have noted that the difference between sections 19.03(a)(6)(A) and 19.03(a)(6)(B) is the degree of "the continuity of the killing." *Rios v. State,* 846 S.W.2d 310, 314 (Tex.Crim. App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993).

When deciding whether the evidence is sufficient to support the jury's finding of guilt, we view the evidence in the light most favorable to the jury's verdict, and determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

Viewed in the light most favorable to the jury's verdict, the evidence at trial establishes that appellant first murdered Karen's father in her parents' house, then her brother in her brother's garage, and then Karen's mother in her parents' garage. A rational jury could have concluded that appellant

murdered Karen's father between 2 p.m. and 3:30 p.m., her brother between 4:15 p.m. and 5:30 p.m., and her mother shortly after 5:30 p.m.. A witness saw appellant in the neighborhood at 2 p.m., and at 3:15 p.m. another witness saw appellant's car in the driveway of the house where Karen's father was killed. At 3:30 p.m. when Karen's daughters came home, appellant told them that "he had already done too much to be forgiven for" and that he was going to go to jail the next day.

After appellant left the children shortly after 4:15 p.m., Karen's oldest daughter saw movement in Bobby's driveway, heard two gunshots, and then saw appellant driving down the road in Karen's father's truck which had been parked in Bobby's driveway. Appellant returned with blood on him and he was sweaty. Appellant told Karen that he had to chase Bobby before he killed him.

After seeing Karen's mother drive past Karen's house around 5:30 p.m., appellant left Karen's house, returning a short while later. When Karen came home shortly before 6 p.m., appellant told her that he had killed her parents and her brother.

A rational jury could have concluded that appellant murdered Karen's parents in the same house—her father in the back room, her mother in the garage—which was a short distance down the road from where he murdered Bobby, and, given the continuity of action, that he committed all three murders over a short period of time, in this particular case, two to three hours. Further, appellant's presence at Karen's house between murders did not interrupt the continuous process of murdering Karen's family. Appellant remained at Karen's house for less than one hour between each murder, Karen's house was across the road from where the murders occurred, and he remained at her house *while awaiting the arrival of his next murder victim.*

■ In determining whether the evidence is sufficient to support the jury's finding that

---

9. The State also argues that the term requires a single guilty intent citing *Mann v. State,* 718 S.W.2d 741 (Tex.Crim.App.1986), *cert. denied,* 481 U.S. 1007, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987); *McIntire v. State,* 698 S.W.2d 652, 655– 56 (Tex.Crim.App.1985); and, *Milligan v. State,* 733 S.W.2d 664, 666–67 (Tex.App.—Austin 1987), *vacated and remanded on other grounds,* 764 S.W.2d 802 (Tex.Crim.App.1989). These cases are inapposite.

appellant committed the murders during the same criminal transaction, we "look to see whether the jury could *rationally* conclude appellant engaged in a continuous and uninterrupted process over a short period of time, of carrying on or carrying out murder of more than one person." *Rios,* 846 S.W.2d at 314 (emphasis added). Given that the three murders occurred in close proximity to each other, on the same road, within a few hours of each other, in a continuous and uninterrupted series of events, a jury could have *rationally* concluded beyond a reasonable doubt that appellant murdered Karen Vicha's father, brother, and mother during the "same criminal transaction." [10] Appellant's fifth point of error is overruled.

## II.

■ In his first point of error, appellant contends the trial court erred by not granting his motion to change venue as a matter of law because the State's controverting affidavit did not comply with Tex.R.Crim.Evid. 602. On November 13, 1989, appellant filed a motion to change venue alleging that he could not receive a fair trial in McLennan County due to pre-trial publicity. Appel-

lant's motion was supported by two affidavits from McLennan County residents each stating that appellant could not "receive a fair trial due to inflammatory and prejudicial newspaper articles as well as television broadcasts concerning the defendant...." Tex.Code Crim.Proc.Ann. art. 31.03(a)(1). The State filed a controverting affidavit from the Chief Deputy Sheriff of McLennan County stating that appellant could receive a fair trial in McLennan County. *Id.* art. 31.04. On November 20, 1989, at the hearing on the motion to change venue, the State's affiant testified that he knew one of the defense affiants and disagreed with his opinion that appellant could not get a fair trial in McLennan County. The State's affiant further testified that he did not know the other defense affiant, and that he did not have any personal knowledge of either affiant's knowledge of the case. Appellant objected to the State's controverting affidavit because it did not state that the information contained therein was within the affiant's personal knowledge. Tex.R.Crim.Evid. 602. The trial court denied appellant's motion for change of venue.

The State's controverting affidavit read as follows:

---

10. The only question before us is whether a jury could *rationally* conclude that appellant committed the murders during the "same criminal transaction" as the jury chose to define the term. The dissent views appellant's motive as evidence that the murders occurred pursuant to the same scheme or course of conduct. This is not at issue. The evidence established appellant murdered Karen's parents and brother to seek revenge on Karen. As previously mentioned, appellant did not want Karen to divorce him, and a few weeks before the instant offense, he kidnapped her at knifepoint in an effort to convince her otherwise. The evidence clearly shows appellant viewed the murders as the same criminal transaction. After he committed the triple murder, appellant told Karen "I've killed your momma [sic] and your daddy and your brother, and they are all dead, and nobody is going to come help you now." Indeed, from the evidence adduced at trial, one can surmise that appellant would have killed Karen's parents and brother in the same room at the same time had they been so present. Because they were not, he waited at Karen's home for each one to come home. According to the dissent, it is this time spent at Karen's home that makes the murders different criminal transactions. The dissent argues because appellant went back to Karen's home between the murders, the murders were not contin-

uous or uninterrupted, and therefore did not occur during the same criminal transaction. However, as previously emphasized, appellant went back to Karen's home to await the arrival of his next murder victim. While he waited, he kidnapped and threatened Karen's children; this, however, did not interrupt his immediate objective of killing Karen's parents and brother nor did it break the continuity of his overall assaultive conduct. Therefore, given the facts of *this* case, the jury could have *rationally* concluded appellant committed the murders during the same criminal transaction.

Additionally, a review of the legislative history of section 19.03(a)(6) reveals that subsection (A) ("same criminal transaction") was intended for mass murders, e.g., "bombs a car killing several people or kills six people in a row at a bar." Subsection (B) ("same scheme or course of conduct"), on the other hand, was intended for serial murders, e.g., "kills all senators over the course of a year for snubbing his legislation." These examples are merely illustrative, not definitive. *See Corwin v. State,* 870 S.W.2d 23, 28, n. 5 (Tex.Crim.App.1993). Although appellant's actions do not fit within either the *typical* mass murder or serial murder scenarios, his actions are more analogous to a mass murder than a serial murder.

My name is [name omitted], and I am a resident of McLennan County, Texas. I have read the Defendant's Application for Change of Venue and the affidavits in support of the Defendant's Motion for Change of Venue in this cause. The affiants of said affidavits are not credible as they are prejudiced to said Defendant and their means of knowledge are not sufficient to support and justify the Statements contained therein. Furthermore, the Defendant can receive a fair and impartial trial in McLennan County, Texas and a jury can be selected which can render a verdict solely on the evidence presented at trial.

This affidavit facially satisfies TEX.CODE CRIM.PROC.ANN. art. 31.04. And, this Court has previously held that the State's affiant need not have actual knowledge of the defendant's affiant or his basis for knowledge. *DeBlanc v. State,* 799 S.W.2d 701, 703–04 (Tex.Crim.App.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); *Cockrum v. State,* 758 S.W.2d 577, 582–83 (Tex.Crim.App.1988), *cert. denied,* 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989); *Lundstrom v. State,* 742 S.W.2d 279, 286–87 (Tex.Crim.App.1987) (op. on reh'g). "[E]vidence which indicates that an appellant can receive a fair trial, if believed by the trial judge, is sufficient to defeat a motion for change of venue." *Cockrum,* 758 S.W.2d at 584. Appellant's first point of error is overruled.

### III.

■ In his second point of error, appellant contends the trial court erred in granting the State's challenge for cause to venireperson Rhodes without allowing him to question the venireperson. Upon the State's questioning, venireperson Rhodes stated that he did not believe in the death penalty and would not assess it under any circumstance. He further stated that based on pre-trial publicity he was convinced appellant was guilty, and he therefore could not be fair and impartial. The venireperson responded affirmatively when the prosecutor asked him if that opinion would influence his verdict. The State then successfully challenged him for cause. The trial court overruled appellant's objection to excusing the venireperson without permitting defense counsel to question him.

Either the State or the defense may challenge a venireperson for cause if through hearsay or otherwise, the venireperson has formed a conclusion about the defendant's guilt or innocence such that it would influence the venireperson in finding a verdict. TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(10). If the venireperson answers affirmatively when asked whether his conclusion will influence his verdict, the trial court shall discharge him without any further inquiry from either side or the court. *Id.* Here, because venireperson Rhodes stated that he believed appellant was guilty and that his belief would influence any verdict he would render in this case, the trial court properly discharged the venireperson without permitting defense counsel to question him.

■ Appellant argues that because the venireperson stated he thought appellant was guilty, the grounds for a challenge for cause existed in favor of the defense and as such the defense had the option of waiving the challenge and accepting the venireperson. Appellant relies on article 35.16(a) which states in part: "All other grounds for challenge [except two, three, and four] may be waived by the party or parties in whose favor such grounds of challenge exist." However, article 35.16(a)(10) specifically states that once the venireperson affirmatively answers that his conclusion would influence his verdict, "he *shall* be discharged without further interrogation by either party or the court." TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(10) (emphasis added). This language only applies to the challenge for cause in subsection 10 and is mandatory in nature; the general language upon which appellant relies is permissive and applies to several different grounds for a challenge for cause. Further, it is questionable whether the challenge for cause in this case was *only* in appellant's favor. *See Nethery v. State,* 692 S.W.2d 686, 686 (Tex.Crim.App.1985) (Because the State has an interest in seeking fair and impartial jurors, "the State is permitted to challenge a juror who cannot be fair and impartial ..."), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Because venireperson

Rhodes stated his belief that appellant was guilty would influence his verdict, the trial court correctly terminated any further questioning and excused the venireperson. *Barnard v. State*, 730 S.W.2d 703, 714–15 (Tex. Crim.App.1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988). Appellant's second point of error is overruled.

■ In his third point of error, appellant contends the trial court erred in denying his challenge for cause to venireperson Herbelin. We need not address the merits of his claim, however, because appellant has failed to preserve this point of error for appellate review. To preserve reversible error in the erroneous denial of a defense challenge for cause, the appellant must show that (1) he exhausted all of his peremptory challenges, (2) the trial court denied his request for additional peremptory challenges, and (3) a venireperson upon whom he would have exercised a peremptory challenge was seated on the jury. *Harris v. State*, 790 S.W.2d 568, 581 (Tex.Crim.App.1989); *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987); *Bell v. State*, 724 S.W.2d 780, 795 (Tex.Crim.App. 1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Because appellant did not exercise all his peremptory challenges, error is not preserved for our review. *Zimmerman v. State*, 860 S.W.2d 89, 94 (Tex. Crim.App.1993). Appellant's third point of error is overruled.

■ In his fourth point of error, appellant contends the trial court erred in overruling his objection to the State's erroneous definition of "criminal acts of violence" as used in the second special issue.[11] The State asked venireperson Thomas whether he could consider an offense other than murder as being a criminal act of violence and suggested ar-

son, aggravated robbery, and assault. Appellant unsuccessfully objected that the State was misleading the venireperson as to the meaning of criminal acts of violence. After appellant's challenge for cause was denied, appellant exercised a peremptory challenge against this venireperson.

■ Because the phrase "criminal acts of violence" as used in the second special issue is not defined for the jury,[12] error in the voir dire examination occurs when the State attempts to limit the venire to its definition. *Jackson v. State*, 822 S.W.2d 18, 25 (Tex. Crim.App.1990), *cert. denied*, ── U.S. ──, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993). In this instance, the State did not attempt to limit venireperson Thomas to its view of what constitutes a "criminal act of violence." In fact, the State emphasized that "[i]t would be up to the juror to determine what in his or her mind is a criminal act of violence." Appellant's fourth point of error is overruled.

### IV.

■ In his sixth point of error, appellant contends the trial court erred in not submitting a jury instruction on the affirmative defense of insanity. Section 8.01(a) of the Texas Penal Code provides an affirmative defense to prosecution if "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX.PENAL CODE ANN. § 8.01(a). "The insanity defense provided in Section 8.01 of the Penal Code shall be submitted to the jury only if supported by competent evidence." TEX.CODE CRIM.PROC.ANN. art. 46.03, § 1(a).

At trial, Karen's oldest daughter testified that when appellant tied up the children, he made some references to his involvement in the Vietnam war and showed the children his war injury.[13] She further testified that ap-

---

11. At the time of appellant's trial in 1989, the second special issue asked, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" TEX.CODE CRIM. PROC.ANN. art. 37.071(b)(2).

12. *Goss v. State*, 826 S.W.2d 162, 169 (Tex.Crim. App.1992), *cert. denied*, ── U.S. ──, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *King v. State*, 553

S.W.2d 105, 107 (Tex.Crim.App.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978).

13. The prosecutor asked Karen's oldest daughter what appellant said to them and she replied:
 Well, he was in there for a while just mentioning all sorts of things. He talked about— earlier he said that about the war. He said, "I've seen bodies fly through the air." And he

pellant knew what he did was wrong. Karen testified that when appellant was at her house and later when he kidnapped her, he appeared to know who and where he was, what he was doing, and who she was. A nurse who was present when the doctors treated appellant in the emergency room testified that appellant appeared to know who and where he was; he was not "irrational" or "out of control." A deputy sheriff who was also in the emergency room further testified that appellant did not appear to be re-living any war experience. A defense investigator displayed a videotape of Vietnam war battles, some involving appellant, and appellant's military records; however, appellant did not present any evidence, expert or lay, that at the time of the murders he did not know his conduct was wrong. Because the evidence at trial did not raise the affirmative defense of insanity, the trial court did not err in refusing to submit that issue to the jury. TEX. CODE CRIM.PROC.ANN. art. 46.03, § 1(a); see Denison v. State, 651 S.W.2d 754, 760 (Tex. Crim.App.1983). Appellant's sixth point of error is overruled.

 In his seventh point of error, appellant contends the trial court erred in not submitting a jury instruction on self-defense. Appellant argues that because the evidence at trial established that a struggle occurred between himself and his former brother-in-law, the trial court should have included a jury instruction on self-defense in the court's charge. The use of deadly force in self-defense is only justified if the use of non-deadly force is justified. TEX.PENAL CODE ANN. § 9.32(1). Generally, the use of non-deadly force is *not* justified "if the actor provoked the other's use or attempted use of unlawful force[.]" *Id.* § 9.31(b)(4). However, even though an actor has provoked a confrontation, he can justifiably use force if:

> said, "I had to kill them not because I wanted to but because I had to. And then he asked us if we wanted to see his wound that he had been shot in the leg, and it was on his left thigh. And then he said that that's where he had been wounded in the war. And that was all he said about that. * * *"

**14.** *See supra* footnote 6.

(A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the counter; and

(B) the other nevertheless continues or attempts to use unlawful force against the actor.

*Id.*

The evidence at trial established that from the outset appellant intended to kill Bobby and Bobby unsuccessfully resisted. There is no evidence in the record that appellant attempted to retreat or discontinue his use of force against Bobby. Indeed, appellant's statements to Karen established that it was Bobby, not appellant, who acted in self-defense.[14] We hold that the evidence did not raise self-defense. *Lockhart v. State*, 847 S.W.2d 568, 574–75 (Tex.Crim.App.1992); *Dyson v. State*, 672 S.W.2d 460, 463–65 (Tex. Crim.App.1984); TEX.PENAL CODE ANN. § 9.31(b)(4). Therefore, the trial court did not err in refusing to submit that issue to the jury. Appellant's seventh point of error is overruled.

## V.

 In his eighth point of error, appellant complains of four instances of improper prosecutorial jury argument at the guilt/innocence phase of trial. The State contends the second and third instances are proper and that appellant has waived any error with respect to the first and last instances because he does not present any authority or argument on appeal to support the first and last instances. *Coffey v. State*, 796 S.W.2d 175, 180 (Tex.Crim.App.1990); *see State v. Gonzalez*, 855 S.W.2d 692, 697 (Tex.Crim.App.1993); TEX.R.APP. P. 210(b) & 74(f). While we agree that this point of error is inadequately briefed, appellant's claim also fails on the merits.[15]

**15.** The State also argues that this point of error is multifarious and presents nothing for our review. *Sterling v. State*, 800 S.W.2d 513, 521 (Tex.Crim.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991). However, issues relating to the same theory of recovery or defense can be combined in an appellate brief, if the appellant makes separate references to the record for each contention. *See Armstrong v. State*, 845 S.W.2d 909 (Tex.Crim.App.1993).

██ At the end of the guilt/innocence phase of trial, defense counsel argued at length to the jury that the instant offense did not occur during the "same criminal transaction." [16] The prosecutor argued the following in response:

> If you go out here and buy a car, you go out and test drive one. You go back day after day negotiating with the dealer trying to get a better price. Is that not one transaction?
>
> Perhaps the best example that I can come up with of one transaction is the very thing you people have sat here for six days and listened to this trial, Cause No. 89–1036–C, The State of Texas versus Billie Wayne Coble. Jury selection took four weeks in this case. You have been listening to testimony in the trial itself for six days. But is it not one trial united by a common purpose and continuity of action? Of course it is. Of course it is.
>
> They talk about common sense. For crying out loud. I'll tell you what. If you 12 people can find him not guilty of capital murder because you have hung up on that issue of criminal transaction, then be my guest. But I will tell you what you will have done if you do that. You will have put an awfully cheap price on the value of innocent human life.
>
> You know, don't you see what they are trying to do by asking you to find him not guilty of capital murder? The punishment range for murder is five to 99 years or life. And that's the most you can do to him.

And he is going to have the same punishment for killing three people as he would for having killed one. If you find him guilty of murder and not capital murder, he has gotten two free killings. Now, you think about that. He's gotten three for the price of one if you buy this criminal transaction nonesense [sic] that they are trying to sell you.

> There is a saying among lawyers that if you don't have the law on your side, you try the facts. If you don't have the facts, you try to argue the law. And when you have neither on your side, you argue something ridiculous.

[Defense Counsel]: Your Honor, I'm going to object.

[Prosecutor]: That's where they are.

[Defense Counsel]: Your Honor, at this time I object. The prosecutor is well outside the bounds of propriety here. He's striking the defendant across my shoulders. And that is in violation of my client's rights to a fair trial under the Sixth, Eighth, anad [sic] 14th Amendments to the Constitution of the United States.

THE COURT: Overrule the objection. Go ahead.

[Prosecutor]: He talks fair trial. [Appellant] has been given a fair trial. And let's think about who wasn't given a fair trial.

> Did [Karen's father] have a judge and a jury and lawyers to represent him before this defendant took this gun and pumped

---

16. Defense counsel told the jury that "same criminal transaction" within the meaning of the penal code requires "[o]ne act, one place, one time. Change any one of those, you're getting out of the same criminal transaction. Use your common sense and logic." Later, defense counsel argued:

> We don't have one criminal transaction, because there was not one criminal transaction. This man may be guilty of three murders. He is not guilty of capital murder. That's why the District Attorney thinks it's important to come up here and try to explain to you what the State thinks one criminal transaction means. That's the only reason.
>
> * * * * * *
>
> If you went to the H.E.B. and bought a banana, and you went next door to T.G. & Y. and bought a toy for your child, and you went

back to the H.E.B. and bought an apple, do you have one transaction, even if both stores are in the same shopping center? Of course you do not.

> If anything, this man is guilty of murder. And as you all well know from what we talked about, that leaves a wide range of punishment open to you when you consider the rest of the evidence in this case. If you find this man guilty of capital murder, your choices are down to two. Life or death.
>
> I suggest you should not find him guilty of capital murder because, number one, he is not guilty of capital murder. If after reviewing the evidence in your own mind you determine that he is guilty of murder, then you have an option based upon what you may or may not hear in the second part of the trial to determine what would be a fair verdict for this man.

two shells into his brain in the back of his head?

Did Bobby Vicha have a jury sitting thinking about his rights when he pumped three bullets into him? What do you think Bobby Vicha's last thoughts were as he lay there with a bullet wound in the kneecap, in the thigh watching this defendant point his own gun at him?

[Defense Counsel]: Object to argument based on facts not in evidence, Judge.

THE COURT: Overruled.

[Prosecutor]: What do you think went through his mind? Do you think he might have liked to have had a fair trial?

And [Karen's mother] driving home at the end of another day as she had done for 30 years unconscious that her husband of many years was wrapped up like a mummy in the den of their house with two bullets in his brain and the son that she nurtured and raised all her life had gasped out his life's blood in his own vehicle shot by his own gun. Do you think any of those thoughts went through her mind? Of course not.

She gets out of her car. And from a distance of about three feet he shoots her twice with her own son's gun. And the blood from all that is still on this pistol. And I submit to you that the blood from that is still on this defendant's hands. Justice waits for you to do what is required in this case under the evidence.

Now, I don't want you people to be on a guilt trip. But what they are looking for is one weak person on this jury.

[Defense Counsel]: Your Honor, I'm going to object to that argument. That argument is not based on facts and evidence here in this case. It's not based on the law or any other principle that is arguable in a case like this.

THE COURT: Overrule the objection.

[Prosecutor]: They are looking for one weak link, just one to pull him out of the hole they are in. Don't let it be any of you. Have courage, be strong. Justice and the evidence in this case cries out for a proper verdict. Do not be dissuaded from that.

They to [sic] talk about emotion not playing a part. If you can hear the evidence in this case and not let emotion play some part, then you are not human. [sic] and we can turn this type of thing over to computers who can weigh the evidence, coldly and dispassionately.

This defendant stands convicted by his own words on the tape recording you heard when he sat there and said, "Did they tell you I've killed three people?" Do you think he thought of it as anything but one transaction? Of course he didn't. He's going to get to read about himself in the papers.

I implore you in the name of all human decency to have the courage and the decency to reach the right verdict in this case, and that is to find him guilty of capital murder. Seriously, if you can't do that, after the trial is over I want you to meet with me and tell me why you couldn't do it.

[Defense Counsel]: Your Honor, I'm going to object at this point. The District Attorney or Assistant is trying to get the jury to agree to explain their verdict. As the Court well knows, that is not part of our law. That's in violation of my client's rights to have to ask them to explain their verdict after this trial is over.

THE COURT: Overruled. Go ahead.

■ Permissible jury argument falls within four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and, (4) pleas for law enforcement. *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App.1973) (citations omitted); *see, e.g., Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992) (citation omitted); *Cantu v. State*, 842 S.W.2d 667, 690 (Tex.Crim. App.1992) (citation omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App.1990) (citations omitted). Argument which exceeds these areas is erroneous. *Felder*, 848 S.W.2d at 95.

■ Appellant's first complaint of improper jury argument is that the prosecutor struck at him over the defense counsel's

shoulders. The State argues the prosecutor's remark that defense counsel was arguing "something ridiculous" was in response to defense counsel's argument that the murders did not occur during the same criminal transaction. Generally, a remark that strikes at the defendant through his counsel is improper. *Todd v. State,* 598 S.W.2d 286, 297 (Tex.Crim.App. [Panel Op.] 1980); *see, e.g., Gomez v. State,* 704 S.W.2d 770 (Tex.Crim.App.1985) (prosecutor's argument that defense counsel manufactured evidence and was paid to do anything to get the defendant "off the hook" was improper); *Lopez v. State,* 500 S.W.2d 844, 846 (Tex.Crim.App.1973) (prosecutor's argument that defendant and defense counsel were lying when they plead not guilty was improper). "This Court has shown a special concern for final arguments that constitute uninvited and unsubstantiated accusations of improper conduct directed at a defendant's attorney." *Gomez,* 704 S.W.2d at 771 (citations omitted). Unlike the argument in *Gomez,* and *Lopez,* the prosecutor's argument here was not directed at defense counsel, but defense counsel's argument. "Counsel is generally afforded wide latitude in drawing inferences from the record, as long as such inferences are reasonable and offered in good faith." *Cantu,* 842 S.W.2d at 691 (citation omitted). We cannot say on the basis of this record that the trial court erred in overruling appellant's objection that the prosecutor struck at him over defense counsel's shoulders. *See Gorman v. State,* 480 S.W.2d 188, 190 (Tex.Crim.App.1972) (prosecutor's comment "[d]on't let him smoke-screen you, he has smoke-screened you enough" was in response to defense counsel's argument attempting to minimize the defendant's prior criminal record).

■ Appellant's second complaint of improper jury argument is that the prosecutor argued outside the record in stating:

*He talks fair trial.* [Appellant] has been given a fair trial. *And let's think about who wasn't given a fair trial.*

*Did [Karen's father] have a judge and a jury and lawyers to represent him* before this defendant took this gun and pumped two shells into his brain in the back of his head?

*Did Bobby Vicha have a jury sitting thinking about his rights when he pumped three bullets into him?* What do you think Bobby Vicha's last thoughts were as he lay there with a bullet wound in the kneecap, in the thigh watching this defendant point his own gun at him?

Forensics evidence established that Bobby died as a result of multiple gunshot wounds to his head, but that he also received gunshot wounds in his leg. Other evidence established that appellant inflicted those wounds with Bobby's service revolver, and that Bobby attempted unsuccessfully to defend himself. The prosecutor's remark concerning Bobby's last moments was a reasonable deduction from the evidence.

■ However, a prosecutor's comment to the jury on an objection that defense counsel makes should not be condoned. *See Felder v. State,* 564 S.W.2d 776, 779 (Tex.Crim.App.1978) (prosecutor's argument that some lawyers object in order to break prosecutor's train of thought, referring to two preceding defense objections, was improper), *cert. denied,* 440 U.S. 950, 99 S.Ct. 1433, 59 L.Ed.2d 640 (1979). The portion of the prosecutor's remarks asking whether Bobby and his father were thinking of having a fair trial certainly was not a summation of the evidence adduced at guilt/innocence; nor was it a reasonable deduction from that evidence or a plea for law enforcement. And, because the only time defense counsel made any reference to appellant having or not having a fair trial was in his objection immediately preceding this portion of the prosecutor's argument, the prosecutors remarks were not in response to appellant's closing argument. Because the portion of the prosecutor's closing argument asking the jury to speculate on whether Bobby or his father wanted a "fair trial" before they were murdered did not fall within the four permissible areas of jury argument, that portion of the State's argument was in error. *Felder,* 848 S.W.2d at 95.

■ In determining whether improper prosecutorial jury argument is harmless, we "must calculate as much as possible the probable impact of the error on the jury in light of the [entire record]." *Orona v. State,*

791 S.W.2d 125, 130 (Tex.Crim.App.1990). In conducting this harm analysis, we consider the nature and source of the error, the degree the prosecutor emphasized the erroneous jury argument, probable collateral implications, how much weight a juror placed on the erroneous jury argument, and whether holding the improper jury argument harmless would encourage the State to repeat it. *Id.; Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). In applying these standards, we recognize that "overwhelming evidence of guilt is a variable to be calculated[.]" *Orona,* 791 S.W.2d at 130. "We also consider the argument of the parties...." *Madden v. State,* 799 S.W.2d 683, 700 (Tex.Crim.App.1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991). The error occurred during jury argument which is not considered evidence. Although the prosecutor did emphasize that the victims did not receive a fair trial, when the State's argument is viewed in its entirety, the prosecutor did not emphasize it to such a degree that the jury would put much weight on it. The record consists of over 700 pages of testimony from State's witnesses; the complained of jury argument consisted of only a few lines of the State's closing argument which was about 15 pages. Defense Counsel's closing argument was about 11 pages. Further, given appellant's admissions to his former wife, hospital personnel, and police officers, and the testimony of his former wife and her children, as well as the other evidence of appellant's guilt at trial, we conclude beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex.R.App. P. 81(b)(2).

■ Appellant's third complaint of improper jury argument is to the prosecutor's statement: "Now, I don't want you people to be on a guilt trip. But what they are looking for is one weak person on this jury." The State argues the prosecutor's remark was in response to defense counsel's argument that the murders did not occur during the same criminal transaction and appellant therefore was not guilty of a capital offense. The

prosecutor urged the jury not to falter on that point. Given that counsel is afforded some latitude in drawing inferences from the record, as previously mentioned, we cannot say the trial court erred in overruling this objection.

■ As for appellant's fourth complaint of improper jury argument, we agree with appellant that the prosecutor's argument asking the jury to explain its verdict was improper. *See Carter v. State,* 650 S.W.2d 843, 847–48 (Tex.App.—Houston [14th Dist.] 1982), *aff'd,* 650 S.W.2d 793 (Tex. Crim.App.1983).[17] The trial court should have sustained appellant's objection and instructed the jury to disregard the comment. By overruling the objection, the trial court put " 'the stamp of judicial approval' on the improper argument, thus magnifying the possibility of harm." *Good v. State,* 723 S.W.2d 734, 738 (Tex.Crim.App.1986) (quoting *Burke v. State,* 652 S.W.2d 788, 790 (Tex.Crim.App. 1983)). However, the prosecutor did not emphasize the issue; after the trial court ruled on appellant's objection, the prosecutor did not mention it again. Despite the severity of the error, in line with the reasoning as stated above, we do not believe the jury gave much weight to the prosecutor's erroneous argument. Although we can conceive of situations when such a statement would be harmful, on the basis of this record, as stated above, it is not. We conclude beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex.R.App. P. 81(b)(2). Appellant's eighth point of error is overruled.

## VI.

■ In his ninth point of error, appellant contends the jury instruction given in the punishment charge did not provide the jury with an adequate means in which to give effect to mitigating evidence in violation of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The court's charge authorized the jury to answer at least

---

**17.** In *Carter,* the prosecutor asked the jury "to walk out and tell [rape victim] and face her and tell her [rape victim], it was all for nought [sic]. That's what you have to do." The Fourteenth Court of Appeals held that the jury argument was improper, but not reversible. This Court affirmed on different grounds.

one of the special issues negatively if they concluded that because of mitigating circumstances appellant should receive a life sentence.[18] We have held that a jury nullification charge is sufficient to meet *Penry* requirements. *San Miguel v. State*, 864 S.W.2d 493, 495 (Tex.Crim.App.1993); *Fuller v. State*, 829 S.W.2d 191, 209 (Tex.Crim.App. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). Moreover, appellant fails to point to any evidence to which the jury could not give mitigating effect absent a *Penry* instruction. Appellant's ninth point of error is overruled.

■ In his tenth, eleventh, and twelfth points of error, appellant contends the trial court erred in failing to define the terms "criminal acts of violence," "continuing threat to society," and "probability" as they are used in the second special issue.[19] Appellant contends that without such definitions the jury could not consider and give effect to mitigating evidence. However, even with respect to the consideration of mitigating evidence, those terms do not have to be defined for the jury. *Draughon v. State*, 831 S.W.2d 331, 339 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993); *see also Goss v. State*, 826 S.W.2d 162, 169 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *King v. State*, 553 S.W.2d 105, 107 (Tex.Crim.App.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). Appellant's tenth, eleventh, and twelfth points of error are overruled.

■ In his thirteenth point of error, appellant contends the placement of the "yes" answer immediately following each special issue and before the "no" answer constituted a comment on the weight of the evidence and a violation of his presumption of innocence. Appellant cites, and we are aware of, no authority for this point of error. Since appellant had been convicted of capital murder at the guilt/innocence phase of trial, he was no longer presumed innocent, and we do not view the order of the answers to the special issues as a comment on the weight of the evidence. Appellant's thirteenth point of error is overruled.

■ In his fourteenth point of error, appellant contends the trial court erred in failing to submit the third special issue. At the time of appellant's trial, if the evidence raised the issue at trial, the trial court submitted a third special issue which asked: "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex.Code Crim.Proc.Ann. art. 37.071(b)(3). The trial court overruled appellant's objection to its omission. Appellant argues the evidence established that appellant and Bobby struggled before Bobby was killed. However, appellant was not entitled to the submission of the third special issue because the evidence did not establish, nor does appellant argue, any provocation on behalf of Karen's *mother*, the first person named in the indictment. Tex.Code Crim.

---

**18.** The jury instruction read as follows:

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider the mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented *by the State or the Defendant*. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the *defendant's personal culpability* at the time you answer the special issue. *If you determine when giving effect to the mitigating evidence, if*

*any, that a life sentence rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the special issues under consideration.*
(emphasis added).

Appellant objected to this instruction claiming it shifted the burden of proof to appellant to establish mitigating evidence, it was confusing and did not give the jury a clear means to give mitigating effect to any mitigating circumstances, and it violated the jury's oath to answer the special issues truthfully. After overruling appellant's objections, the trial court denied appellant's requested instruction on mitigating evidence.

**19.** *See supra* footnote 11.

PROC.ANN. art. 37.071(f).[20] Appellant's fourteenth point of error is overruled.

In his fifteenth and final point of error, appellant contends the trial court erred in failing to include a jury instruction in the punishment charge cautioning the jury to only consider those extraneous offenses proved beyond a reasonable doubt to have been committed by appellant. This court has held that the failure to give such an instruction is not error when the charge, as here, properly sets forth the State's burden of proof. *Marquez v. State,* 725 S.W.2d 217, 226 (Tex.Crim.App.), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987); *Santana v. State,* 714 S.W.2d 1, 11 (Tex. Crim.App.1986); *see Boyd v. State,* 811 S.W.2d 105, 123 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991). Appellant's final point of error is overruled.

The judgment of the trial court is AFFIRMED.

BAIRD, J., Believing the State correctly argues that the eighth point of error is multifarious and presents nothing for review, I would not reach the merits of appellant's contentions. I therefore concur in the disposition of the eighth point of error and join the remainder of the opinion.

CAMPBELL, J., joins this note.

CLINTON, Judge, dissenting.

In his fifth point of error appellant contends that to hold the evidence sufficient to convict him of capital murder under V.T.C.A. Penal Code, § 19.03(a)(6)(A) is to blur the distinction between that provision and V.T.C.A. Penal Code, § 19.03(a)(6)(B). The majority acknowledges this contention but then never squarely addresses it. Instead the majority simply concludes, problematically, in my view, that a jury could have concluded the murders occurred "during the same criminal transaction." This holding does indeed blur the distinction between subsections (A) and (B) of § 19.03(a)(6), and in the process threatens to render unconstitutional what until now we have scrupulously endeavored to preserve as constitutional, at least in its application to particular facts.

In *Rios v. State,* 846 S.W.2d 310 (Tex.Cr. App.1992), the Court recognized that subsections (A) and (B) of § 19.03(a)(6) are mutually exclusive. That is to say, whereas murder of more than one person is a capital offense under the former provision if committed "during the same criminal transaction[,]" multiple murders are capital under the latter provision only if committed "during different criminal transactions but ... pursuant to the same scheme or course of conduct." No doubt a capital accused may be indicted under both theories in the alternative, with the factfinder to sort out which theory, if either, best fits the facts of the case. Given a general verdict of guilty, this Court would likely affirm if the evidence was sufficient to support either theory. But surely a capital accused cannot be found to have committed the same multiple murders both ways—at least not consistently with *Rios.* Here appellant was indicted only for murdering three persons during the same criminal transaction. The evidence at trial establishes the killings occurred during different transactions but pursuant to the same scheme or course of conduct. Loath to acquit a capital accused on the basis of such a variance of proof, the majority instead extends the concept of "same criminal transaction" beyond the breaking point, and in the process obliterates the line between the two theories of capital murder, contrary to due process and due course of law, not to mention plain legislative intent.

In *Rios,* supra, and in *Vuong v. State,* 830 S.W.2d 929 (Tex.Cr.App.1992) before it, we applied a very narrow understanding of "same criminal transaction." In the latter case, we did so to avoid addressing the merits of the claim that § 19.03(a)(6)(A) was unconstitutionally vague. Appellant makes no such claim here, and so the majority apparently feels no such constraint as in

---

**20.** Recently, we held that article 37.071(f) was unconstitutionally applied to a particular defendant because it precluded the jury from giving mitigating effect to the provocation of the second named victim in the indictment. *First v. State,* 846 S.W.2d 836 (Tex.Crim.App.1992). In this case, however, appellant does not present such a claim.

*Vuong.* Nevertheless, the majority applies subsection (A) in a way that is sure to invite future claims of unconstitutional vagueness.

In *Rios* we held that in measuring sufficiency of the evidence under subsection (A) "we will look to see whether the jury could rationally conclude appellant engaged in a continuous and uninterrupted process, over a short period of time, of carrying on or carrying out murder of more than one person." 846 S.W.2d at 314. As events stretch out over time, however, it becomes more difficult to say with confidence that they occur "in a continuous and uninterrupted process," or "over a short period of time." The meanings of such phrases are relative, and usually context-dependent. In the recent case of *Corwin v. State,* 870 S.W.2d 23, at 28–29 (Tex.Cr.App., delivered 1993), we said of § 19.03(a)(6)(*B* ) that "in hypothetical cases, as time and distance between murders committed during different transactions increases, and as the actor's motive or *modus operandi* vary, it will become more difficult for putative defendants and law enforcement agencies to say with certainty that the murders occurred 'pursuant to the same ... course of conduct.' " It may be said, similarly, that as time and distance increases, it becomes increasingly tenuous to describe events as occurring "in a continuous and uninterrupted process ... over a short period of time." At some point it must be said that the statute fails to give notice that a multiple killing *is* in fact a capital crime under § 19.03(a)(6)(A), supra.

In *Vuong* the killings took place within moments of each other, with no pause in the proceedings. In *Rios* the evidence supported a finding that the murders were only moments apart. Thus we were able to say without hesitation that the conduct of Vuong and Rios fell within what was clearly the "core" conduct proscribed by § 19.-03(a)(6)(A), supra. Cf. *Corwin v. State,* supra at 28–29. Here the majority describes "two to three hours" as "a short period of time." While I agree that two to three hours is a short period of time relative to, say, two or three years, I would not describe two to three hours as "a short period of time" compared to two or three minutes, or two or

three seconds. Nor can I say with the kind of certainty possible in *Vuong* that appellant's conduct was continuous and uninterrupted. Again, these are not terms of absolute value. The killings occurred over a number of hours, and at three separate locations. Between each killing appellant went back to Karen Vicha's house. Thus the killings may be said to have been "interrupted" in the sense, at least, that the actual bodily movements by which the killings were perpetrated were not sequential. I would *not* construe "continuous and uninterrupted" simply to mean occurring with some degree of regularity, because once again that would blur the distinction between § 19.03(a)(6), subsections (A) and (B). *Corwin,* supra at 28–29.

Under the carving doctrine the State was allowed to carve only one offense out of a single criminal transaction for prosecution, irrespective of how many penal proscriptions may have been violated. Because application of the carving doctrine often meant limiting the number of available prosecutions permitted for heinous crimes, there was an inherent pressure upon this Court to construe "same criminal transaction" narrowly. It may fairly be said that it was the vagueness of language used to gauge when one offense ended and another began for purposes of carving that led, in part, to its ultimate demise, in *Ex parte McWilliams,* 634 S.W.2d 815 (Tex.Cr. App.1982) (Opinion on rehearing). But of one thing I think we can be reasonably sure: this Court would never have concluded under carving that appellant killed his three victims during the same criminal transaction. E.g., *Hester v. State,* 544 S.W.2d 129 (Tex.Cr.App. 1976).

"Same criminal transaction" was not defined by the legislature in § 19.03(a)(6), supra. Common acceptation is all we have to go on. We have always construed "transaction" narrowly in the carving context, again without benefit of any technical, legislatively defined meaning. That the Court now chooses to construe the phrase "same criminal transaction" more expansively may be attributed, I think I can suggest without undue cynicism, not to a change in our understanding of that phrase in common acceptation in

English, but to an unpalatable outcome should we adhere to our prior, more narrow understanding of the phrase in the present context.

In common acceptation what appellant did here falls readily into the category of murder of more than one person "during different criminal transactions ... pursuant to the same scheme or course of conduct," under § 19.03(a)(6)(B). No doubt had the State indicted appellant under this theory, the Court would have had no trouble holding the evidence sufficient—and justly so, for that is the theory the record supports. But the Court cannot have it both ways. Failing to insist that prosecution in this cause should have been predicated upon § 19.03(a)(6)(B), the majority threatens the constitutional viability of § 19.03(a)(6)(A).

I therefore respectfully dissent.