COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-506-CR
 
 
ANGELA 
NEW                                                                       APPELLANT
 
  
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
------------
 
FROM 
THE 367TH DISTRICT COURT OF DENTON COUNTY
 
------------
 
OPINION
 
------------
 
I. Introduction
        A 
jury convicted Appellant Angela New of the first-degree felony offense of 
intentionally or knowingly causing serious bodily injury to a child. The jury 
assessed punishment at ninety-nine years’ confinement, and the trial court 
sentenced her accordingly. In four issues, New complains that the trial court 
erred by (1) granting the State’s motion in limine restricting her voir dire, 
(2) denying her challenges for cause and allowing unqualified jurors to sit on 
the jury, (3) permitting her conviction based on insufficient evidence of mental 
intent to commit the offense of injury to a child, and (4) admitting photographs 
that were more prejudicial than probative. We will affirm.
II. Factual 
Background
        A 
baby boy, Kobe New (Kobe), was born on August 23, 2000 in Georgia to Jennifer 
Ankrom and Phillip New (Phillip), who were never married. Ankrom testified that 
Kobe went to live with Phillip, Appellant Angela New (New), and her two children 
around October 2002. Kobe died on February 15, 2003; New was the only adult 
present at the time Kobe received his deadly injury.
        New 
told the police and the paramedics several versions of the events surrounding 
Kobe’s death. Ultimately, she wrote out a statement that was read to the jury:
   
I was real frustrated with my daughter.  She was crying a lot for no 
reason, if I didn’t pick her up or change her diaper or if she didn’t get 
her way.  I went to the bedroom to try and calm down.  Then I heard 
Kobe crying, which got me even more frustrated.  I went to the living room 
to tell him to stop crying.  And every time I told him to stop crying, he 
got louder.  So I shook him a little bit.  And when he didn’t stop 
crying, I hit him on the forehead twice with my palm.  With the second hit, 
he fell and his head hit [on] the hard part of the couch.
  
I 
didn’t realize anything because I was so mad.  Then I grabbed him and 
shook him some more. I guess his head was hitting the floor.  I stopped and 
tried to get him to stand up but he couldn’t.  Then I--then I looked at 
him and his eyes looked weird, so I picked him up and started to rub his hair 
and call his name.  When he didn’t respond, I took off his clothes and 
turned on the water from the tub and dipped his head into it.  Then I laid 
him on the floor and started pushing in his stomach or lungs with my fingers to 
get him to breathe.  Then I called the ambulance.  When I get mad and 
frustrated, I can see what I’m doing but for some reason I can’t stop myself 
no matter how hard I try.
 
        After 
hearing the above statement, as well as testimony from the paramedics, the 
pediatric radiologist, other medical personnel, and the police, the jury found 
New guilty and assessed her punishment at ninety-nine years’ confinement. This 
appeal followed.
III. Trial 
Court Properly Granted Motion in Limine and
Properly Denied 
Challenges for Cause
        Before 
trial, the State submitted a motion in limine requesting that New approach the 
bench and obtain a ruling before referring to various facts in voir dire, 
including that New was Kobe’s stepmother, that Kobe had died or other facts 
relating to the nature of Kobe’s injury, and Kobe’s age. The trial court 
granted the State’s motion in limine.
        During 
voir dire, New’s counsel attempted on several occasions to pinpoint whether 
venire members could consider the entire range of punishment (specifically, five 
years’ probation) regardless of the type of case (e.g., whether there was 
slight abuse or death of the child). The State objected several times to the 
wording of New’s counsel’s questions, and other times he was able to ask the 
question without objection.
        Several 
venire members explained that they could not consider five years’ probation if 
the result of the serious bodily injury was the death of the child; however, 
they stated that they could consider the full range of punishment for the crime 
charged—serious bodily injury to a child. New’s counsel raised challenges 
for cause on venire members Mr. Wilson and Mr. Shivers, and the trial court 
denied the challenges. New’s counsel exercised a peremptory strike on Mr. 
Wilson and requested additional peremptory strikes. The trial court denied that 
request. New’s counsel explained that he was left with objectionable jurors on 
the panel[1] and moved to quash the entire jury panel 
based on comments made by venire members with regard to the range of punishment 
and type of offense involved. The trial court denied the request.
        In 
her first issue, New argues that the trial court abused its discretion by 
granting the State’s motion in limine restricting her voir dire. Specifically, 
New complains that she was not allowed to inquire as to the death of the child 
during voir dire. Consequently, New argues in her second issue that the trial 
court erred and abused its discretion by denying challenges for cause to the 
venire members who responded that they could not be fair and impartial if facts 
were made known that the criminal offense resulted in the death of the child.[2]
        A.     Propriety 
of Ruling on Motion in Limine
        A 
ruling on a motion in limine does not purport to be one on the merits but one 
regarding the administration of the trial. Harnett v. State, 38 S.W.3d 
650, 655 (Tex. App.—Austin 2000, pet. ref’d). The granting of a motion in 
limine will not preserve error. Wilkerson v. State, 881 S.W.2d 321, 326 
(Tex. Crim. App.), cert. denied, 513 U.S. 1060 (1994). Therefore, it is 
necessary that an objection be made when the subject is raised. Id.
        The 
trial court has broad discretion over the process of selecting a jury. Barajas 
v. State, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); Allridge v. State, 
762 S.W.2d 146, 167 (Tex. Crim. App. 1988). The main reason for this is that 
voir dire could go on forever without reasonable limits. Barajas, 93 
S.W.3d at 38; Faulder v. State, 745 S.W.2d 327, 334 (Tex. Crim. App. 
1987). We leave to the trial court’s discretion the propriety of a particular 
question, and the trial court’s decision will not be disturbed absent an abuse 
of discretion. Barajas, 93 S.W.3d at 38; Allridge, 762 S.W.2d at 
163; Faulder, 745 S.W.2d at 334. A trial court’s discretion is abused 
only when a proper question about a proper area of inquiry is prohibited. Barajas, 
93 S.W.3d at 38; Allridge, 762 S.W.2d at 163.
        A 
question is proper if it seeks to discover a juror’s views on an issue 
applicable to the case. Barajas, 93 S.W.3d at 38; Smith v. State, 
703 S.W.2d 641, 643 (Tex. Crim. App. 1985). An otherwise proper question is 
impermissible, however, if it attempts to commit the juror to a particular 
verdict based on particular facts. Barajas, 93 S.W.3d at 38-39; Standefer 
v. State, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001).
        The 
complaint in New’s first issue is unclear because the record reflects that her 
counsel was permitted to ask the very questions that she claims the trial court 
precluded, that is, questions about the impact of the child’s death on 
jurors’ ability to consider probation. See Appendix to opinion. 
Consequently, the questions that the trial court prohibited did not harm New 
because several versions of the same question were put before the panel. See 
Cook v. State, 398 S.W.2d 284, 288 (Tex. Crim. App.) (holding that no harm 
was shown to have resulted from court’s refusal to allow counsel to ask 
questions of veniremen when qualifications to bill of exception disclosed that 
counsel had been permitted to ask similar questions), cert. denied, 384 
U.S. 966 (1966). With regard to additional questions that New’s counsel wanted 
to ask or that he raised at the bench conference near the beginning of Mr. 
Wilson’s questioning during voir dire, the error, if any, was not preserved 
because the record does not reveal what was said at the bench. See Brazzell 
v. State, 481 S.W.2d 130, 132 (Tex. Crim. App. 1972).
        Therefore, 
the trial court did not abuse its discretion in granting the State’s motion in 
limine. We overrule New’s first issue.
        B.     Propriety 
of Ruling on Challenges for Cause
        We 
review the ruling of a trial court on a challenge for cause based on a 
venireperson’s bias for an abuse of discretion.[3]  
Williams v. State, 773 S.W.2d 525, 536 (Tex. Crim. App. 1988), cert. 
denied, 493 U.S. 900 (1989). In testing the court’s action, we will 
consider the venireperson’s testimony as a whole. Pyles v. State, 755 
S.W.2d 98, 103 (Tex. Crim. App.), cert. denied, 488 U.S. 986 (1988). A 
venireperson who is unable to consider the full range of punishment is subject 
to a challenge for cause. Barrow v. State, 688 S.W.2d 860, 863 (Tex. 
Crim. App. 1985). A venireperson is not disqualified merely because he or she 
could not consider probation under the specific facts of the case being tried 
that go beyond the elements of the offense. Glauser v. State, 66 S.W.3d 
307, 318 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d) (citing Sadler 
v. State, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998)), cert. denied, 
534 U.S. 1129 (2002). When the record reflects that a venireperson vacillates or 
equivocates on his ability to follow the law, the reviewing court must defer to 
the trial court. Moore v. State, 999 S.W.2d 385, 400 (Tex. Crim. App. 
1999), cert. denied, 530 U.S. 1216 (2000).
        Our 
review of the record shows that the prospective jurors were able to consider the 
full range of punishment for the crime of serious bodily injury as defined by 
the law. See Murphy v. State, 112 S.W.3d 592, 599 (Tex. Crim. App. 2003), 
cert. denied, 124 S. Ct. 1660 (2004); Sadler, 977 S.W.2d at 142 
(stating that jurors must be able to consider the full range of punishment for 
the crime as defined by the law). Because death of the victim is a specific fact 
that goes beyond the elements of the offense of serious bodily injury, the 
venirepersons were not required to consider probation for that specific fact 
scenario. See Glauser, 66 S.W.3d at 318. Thus, their feelings regarding 
whether they could give probation if the child died did not disqualify them as 
jurors as a matter of law. See Faulder, 745 S.W.2d at 339-40. Upon 
reviewing all the challenged venirepersons’ responses, we conclude that the 
trial court did not abuse its discretion in overruling the challenges made for 
the inability to consider the minimum range of punishment. See Williams, 
775 S.W.2d at 537; Chapman v. State, 838 S.W.2d 574, 579 (Tex. 
App.—Amarillo 1992, pet. ref’d). Consequently, we overrule New’s second 
issue.
IV. Sufficient 
Evidence of Intent
        In 
her third issue, New argues that there is insufficient evidence to establish her 
mental intent to commit the offense of injury to a child.[4]  
The State responds that the evidence was legally and factually sufficient to 
prove that New intentionally or knowingly caused serious bodily injury to Kobe.
        A.     Legal 
Sufficiency Standard of Review
        In 
reviewing the legal sufficiency of the evidence to support a conviction, we view 
all the evidence in the light most favorable to the verdict in order to 
determine whether any rational trier of fact could have found the essential 
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v. State, 133 S.W.3d 
618, 620 (Tex. Crim. App. 2004).
        This 
standard gives full play to the responsibility of the trier of fact to resolve 
conflicts in the testimony, to weigh the evidence, and to draw reasonable 
inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at 
319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight 
and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art. 38.04 
(Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 
2000).  Thus, when performing a legal sufficiency review, we may not 
re-evaluate the weight and credibility of the evidence and substitute our 
judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 
735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000). We 
must resolve any inconsistencies in the evidence in favor of the verdict. Curry 
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
        In 
determining the legal sufficiency of the evidence to show appellant's intent, 
and faced with a record that supports conflicting inferences, we “must 
presume—even if it does not affirmatively appear in the record—that the 
trier of fact resolved any such conflict in favor of the prosecution, and must 
defer to that resolution.”  Matson v. State, 819 S.W.2d 839, 846 
(Tex. Crim. App. 1991).
        B.     Factual 
Sufficiency Standard of Review
        In 
reviewing the factual sufficiency of the evidence to support a conviction, we 
are to view all the evidence in a neutral light, favoring neither party. See 
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004). The only 
question to be answered in a factual sufficiency review is whether, considering 
the evidence in a neutral light, the fact finder was rationally justified in 
finding guilt beyond a reasonable doubt. Id. at 484. There are two ways 
evidence may be factually insufficient: (1) the evidence supporting the verdict 
or judgment, considered by itself, is too weak to support the finding of guilt 
beyond a reasonable doubt; or (2) when there is evidence both supporting and 
contradicting the verdict or judgment, weighing all of the evidence, the 
contrary evidence is so strong that guilt cannot be proven beyond a reasonable 
doubt. Id. at 484-85. “This standard acknowledges that evidence of 
guilt can ‘preponderate’ in favor of conviction but still be insufficient to 
prove the elements of the crime beyond a reasonable doubt.” Id. at 485. 
In other words, evidence supporting a guilty finding can outweigh the contrary 
proof but still be insufficient to prove the elements of an offense beyond a 
reasonable doubt. Id.
        In 
performing a factual sufficiency review, we are to give deference to the fact 
finder’s determinations, including determinations involving the credibility 
and demeanor of witnesses.  Id. at 481; Cain v. State, 958 
S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment 
for that of the fact finder’s.  Zuniga, 144 S.W.3d at 482.
        A 
proper factual sufficiency review requires an examination of all the 
evidence.  Id. at 484, 486-87. An opinion addressing factual 
sufficiency must include a discussion of the most important and relevant 
evidence that supports the appellant’s complaint on appeal. Sims v. State, 
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).
        C.     Serious 
Bodily Injury to a Child
        The 
first-degree felony of injury to a child is committed when a person 
intentionally or knowingly causes a child serious bodily injury. See Tex. Penal Code Ann. § 22.04(a)(1), (e) 
(Vernon 2003). Injury to a child is a result-oriented offense. Johnson v. 
State, 121 S.W.3d 133, 135 (Tex. App.—Fort Worth 2003, pet. ref’d). A 
person acts intentionally with respect to the nature of her conduct or to a 
result of her conduct when it is her conscious objective or desire to engage in 
the conduct or cause the result. Tex. 
Penal Code Ann. § 6.03(a) (Vernon 2003). A person acts knowingly with 
respect to a result of her conduct when she is aware that her conduct is 
reasonably certain to cause the result. Id. § 6.03(b).
        D.     Testimony 
Received at Trial
        Charles 
House with the Dallas Fire Department dispatch testified that he received a 911 
call on February 15, 2003 from New involving an emergency with a child. He 
stated that he never advised New to do chest compressions on the child.
        Johnny 
Rudder, a Dallas Fire Department paramedic, testified that he responded to a 
call involving an unconscious child or baby on the date in question. When he 
arrived at the apartment, the sick child was lying on the living room floor, not 
moving. New was very quiet and was not near the child. Rudder went to the child 
and saw that the child “was not really moving much, was not breathing 
adequately enough for his age. Seemed to be unconscious and not really with 
it.” He noted that the child’s pupils were sluggish and did not seem very 
reactive to light. He noticed a bruise on the child’s chest and asked from 
where it had come. New responded that she had done chest compressions; however, 
Rudder knew from his training that bruises do not develop that quickly.
        On 
the way to the hospital, New rode in the front of the ambulance. Once they 
arrived at the hospital, Rudder noticed bruises on the child’s back. New told 
him that she was in the other room while the three children were playing, and 
she heard a noise like something dropping or falling. She went in and found Kobe 
like the paramedic saw him. She said that his hair was wet because she put him 
under water to revive him. Rudder further testified that New did not try to gain 
access to the child while they were working on him, and he commented that 
normally it is difficult to get parents away from kids who have been injured.
        April 
Miller, a paramedic with the Dallas Fire Department, testified that she 
responded to an unconscious person call on February 15, 2003. She found a child 
lying in the middle of the floor, and two other children were around the child. 
She said that New had a blank look and thought New’s demeanor reflected that 
she was frustrated that something was wrong and did not know what it was. New 
told Miller that New was in one room and the children were in another room 
playing; they told her that something was wrong with one of the kids. When New 
went into the room where the children were playing, she found Kobe on the 
ground. Because Kobe was not breathing, New said she gave him CPR. New said that 
she thought Kobe’s brother hurt him.
        Miller 
testified that New stayed in the background while the paramedics worked on Kobe. 
When Miller noticed that Kobe’s breath sounds were shallow and that he had a 
bruise on his chest, New stated that she had performed CPR on him. Miller said 
that on the way to the hospital, New never looked through the window to check on 
Kobe in the back of the ambulance. However, New did ask if Kobe was going to be 
okay.
        Tim 
Lennington of the Dallas Police Department testified that Kobe was already in 
the ambulance when he arrived at the scene. He got New’s name and Kobe’s 
name before the ambulance left and then looked around the apartment because the 
Dallas Fire Department was still there. He noted that the bathtub was wet and 
that there was a towel on the floor next to the bathtub. He also noted that the 
apartment was messy, but he did not see any cleaning materials in plain view.
        Later, 
Lennington went to the hospital and spoke with New. She told him that she was in 
the bedroom cleaning, and the children were in the living room playing. She 
heard two or three thumps on the floor and went to see what happened and found 
Kobe on the floor, passed out. When she picked him up, his eyes were rolling 
back in his head, so she ran water over his head to wake him up and then called 
911. Lennington described New’s demeanor at the hospital as quiet and kind of 
puzzled. He noted that New asked how Kobe was doing, but she never asked to stay 
with him. He talked to the doctors and nurses in the emergency room, and they 
showed him some of Kobe’s injuries. He began to suspect child abuse and called 
the child abuse detectives.
        Kim 
Vasquez, the charge nurse at Presbyterian Hospital in Plano (Presbyterian 
Plano), testified regarding Kobe’s condition when he arrived at the emergency 
room on February 15, 2003. She stated that he was unresponsive for the most part 
and responded only to a painful stimulus, was pale, had multiple bruises in 
various stages of healing, exhibited abnormally low neurological functioning, 
and had an inadequate respiratory rate. She explained that the medical team 
intubated Kobe, gave him oxygen, and started an i.v. to give him medications. 
Because Kobe’s condition was critical, the medical team transferred him to 
Children’s Medical Center in Dallas and notified the police and CPS.
        Nurse 
Vasquez spoke to New, who said that Kobe was in a room playing with his siblings 
when she heard a thump. New explained that she went to see what the noise was 
and found Kobe unconscious on the floor. New stated that she did not know what 
caused the bruises on Kobe. Nurse Vasquez noted that New did not try to approach 
Kobe while he was being treated; that she seemed frightened, not in a shocked 
state; and that she never cried.
        Dr. 
Ted Wen, a pediatric radiologist and the medical director of radiology at 
Presbyterian Plano, testified that he saw Kobe’s CAT scans from February 15, 
2003. The CAT scan of Kobe’s head showed a sizeable fracture that went to the 
base of the skull, despite the fact that children’s skull bones are fairly 
flexible. After reviewing the CAT scans, Dr. Wen was concerned about the amount 
of blood throughout Kobe’s brain. Because the child’s x-rays did not 
indicate that he was malnourished or that he had any kind of bone disease and 
because there was no history of known trauma, Dr. Wen ordered a skull survey and 
alerted the proper authorities.
        He 
stated that it would take “a direct blow against a hard surface of a 
significant force” to cause Kobe’s skull fracture. He would expect that 
injury on a very hard surface, like tile or concrete; he would not expect that 
type of injury with a child just falling down on a concrete floor covered with 
very thin carpeting. He stated that it would be more like if a person had taken 
a child and slammed his head on that surface. He said that this type of fracture 
is seen with severe auto accidents in which children are not belted or not in a 
car seat; with falls from two- to three-story buildings; with direct blows to 
the skull with a hard, blunt instrument; or with shoving the skull against a 
hard object like a corner.
        Dr. 
Dale Swift, a pediatric neurosurgeon at Children’s Medical Center of Dallas, 
testified that he was on call when Kobe came to the emergency room. When Kobe 
arrived, he was not breathing, had a tube in his trachea and was being 
mechanically ventilated, had no reaction to touch, and had dilated pupils. After 
seeing the CAT scans, which showed that Kobe’s brain had shifted and that 
there was blood over the surface of his brain, Dr. Swift took Kobe immediately 
to the operating room. He stated that because Kobe’s pupils were dilated and 
not reacting to light, it is conceivable that he was brain dead at that time. 
However, he wanted to give Kobe every chance possible, so he took Kobe to the 
operating room to relieve the pressure on his brain. After Dr. Swift cut a hole 
in Kobe’s skull to let the blood out, he had trouble finding the source of the 
bleeding because the source was deep. During the surgery, Kobe’s heart stopped 
because he was bleeding to death, despite the fact that he was given many 
transfusions. The doctors did chest compressions and eventually pronounced Kobe 
dead.
        Dr. 
Swift said that in his opinion, whether they did the surgery or not, Kobe would 
have died. He explained that Kobe’s heart’s stopping was a function of the 
head injury that led to brain damage and bleeding. Dr. Swift pointed out to the 
jury the “straight-through crack”—a full thickness fracture through the 
skull, from the top of the skull to the base of the skull—on the CAT scans of 
Kobe’s skull and stated that it would take a significant amount of force to 
fracture a child’s skull bone. He said that the force needed to cause the 
fracture would be a substantial force ending in a blow against a hard object. He 
testified that most of these injuries that are this severe result from a 
high-speed or vehicle accident, a fall from the third story of a building, or a 
hit by a baseball bat if it is swung hard enough. He stated that a child could 
not normally cause this type of injury to another child. He concluded that a 
possible hypothetical might involve someone slamming a child into the floor.
        Dr. 
David Dolinak, deputy chief medical examiner at the Dallas County Medical 
Examiner Department, testified that he performed the autopsy on Kobe. He 
determined that the bruises on Kobe’s front side were three to four days old 
by examining the tissue under a microscope. He explained that the bruises on 
Kobe’s back could not have been inflicted by a one- to three-year-old child 
and that the bruise on Kobe’s chest was not from CPR because there were 
multiple bruises in that area extending to the shoulders and arms.[5]  He noted a large, severe fracture that went 
completely through the bone on the back of Kobe’s head and stated that it is 
not unusual to sustain massive head trauma inside while having no external 
injuries. He also noted a bruise in Kobe’s lower lip and stated that it was 
from a blunt force injury. He further stated that the injuries revealed evidence 
of more than one impact because of the separate bruises.
        Dr. 
Dolinak said that Kobe’s injuries are consistent with someone taking a child 
and slamming his head onto a hard surface. He normally sees this type of injury 
result when someone has either slammed or otherwise caused an infant to collide 
with another surface. He ruled Kobe’s death a homicide.
        Detective 
Kimberly Mayfield, who works in the child abuse unit of the Dallas Police 
Department, came into contact with New at Presbyterian Plano after being 
contacted by her sergeant to respond to a situation involving an injured child.[6]  She learned that New was Kobe’s stepmother. New 
gave the following explanation to Detective Mayfield: New was in her bedroom and 
heard a loud thump; she went into the living area and found Kobe on the floor; 
and she guessed that Kobe had climbed up onto the table and Isaiah (the other 
boy in the home) had pulled Kobe off the table.
        After 
gathering the above information at Presbyterian Plano and obtaining New’s 
written consent to search her apartment, Detective Mayfield went to New’s 
apartment to determine how Kobe was injured. New did not request to go to 
Children’s Hospital; instead, she went with Detective Mayfield. When they 
arrived at the apartment, they had to wait for maintenance to come unlock the 
apartment because New did not have a key. While they waited, Detective Mayfield 
asked New to write out an affidavit of fact, and she wrote a little less than a 
page-long affidavit. After Detective Mayfield and Detective Fite[7] read the affidavit, they requested that New write another 
statement with more details, and New agreed.
        After 
maintenance arrived and unlocked the apartment, Detective Mayfield found some 
unusual things. For instance, New mentioned at the hospital that there was a 
broken toy construction hat with blood on it, but it was not broken and had no 
blood on it when Detective Mayfield saw it at the apartment. Detective Mayfield 
also noticed a belt on the stove and a bed roll down in front of the couch. It 
also did not appear that anyone had been cleaning the apartment. After the 
walk-through was completed, New became a suspect and was taken to the police 
station, where she gave a third written statement.
        Detective 
Mayfield testified that during the entire evening, New asked only once how Kobe 
was doing. However, after giving her third statement and being told that Kobe 
had died, she broke down.
        Detective 
Elton Fite with the Dallas Police Department’s child abuse unit testified that 
he received a call to respond to Presbyterian Plano regarding possible abuse of 
a two-year-old child. He echoed Detective Mayfield’s testimony about obtaining 
consent from New to search the apartment, New’s not asking to go to 
Children’s Medical Center to be with Kobe, waiting for someone with a key to 
unlock the apartment, requesting that Detective Mayfield have New amend her 
first written statement to give more detail, and New’s complying and giving 
another statement.
        During 
the walk-through of the apartment, New told Detective Fite that the children 
were in the living room watching television and that she had gone into the 
bedroom to clean up when she heard a loud thumping sound. New said that she 
walked into the living room and found Kobe unconscious, lying on the floor. 
Detective Fite described the apartment as being on the ground floor and having 
worn carpet throughout, except for vinyl flooring in the bathroom and tile on 
the hearth. Like Detective Mayfield, he noted that the toy hard hat was not 
broken or bloody and that it did not appear that anyone had been cleaning in the 
bedroom. Moreover, Detective Fite stated that New was the only adult in the 
house with the kids at the time of Kobe’s injury.
        Detective 
Fite explained that New became a suspect after the walk-through because she was 
the only adult at home when Kobe was injured and because the injuries Kobe 
received did not coincide with New’s version of the events. New agreed to go 
to the police station and talk more. After being read her rights, Detective Fite 
told New that Kobe had a skull fracture that could be caused only by receiving a 
severe blow to his head, that her account of what had happened did not coincide 
with the type of injury he had received, and that no child could have caused 
Kobe’s injury. New gave a third written statement at the police station in 
which she admitted hitting Kobe’s head on the floor. After New signed the 
statement, Detective Fite told her that Kobe had died.
        Detective 
Fite testified that Kobe died from “something that was used by [New].” He 
stated that the toy construction hat and the furniture did not account for the 
extent of Kobe’s injuries because he did not see anything protruding from the 
couch that posed a danger. He confirmed that the floor or a hard object can be a 
deadly weapon. However, he did not take any floor samples or go back to the 
apartment to search for a weapon.
        The 
defense’s sole witness was Teresa Godinez, whose daughter has been friends 
with New since they were nine years old. She testified that New is a great mom 
who took good care of her kids. For example, she said that New paid attention to 
them; played with them; gave them fun things to do; spent time with them; showed 
a lot of love to them by telling them that she loved them and by giving them 
kisses; made sure that they had food, clean clothes, and baths; and made sure 
that they went to the doctor if they needed medicine. She stated that New does a 
good job with children other than her own and that she did well with Kobe. She 
said that Kobe was a little wild but that he actually liked New. On 
cross-examination, she agreed that the little boy in the autopsy picture did not 
look well cared for. She concluded her testimony by stating, “This is not 
Angela.”
        E.     Sufficiency 
of the Evidence
        Here, 
New contends that the only evidence offered by the State regarding her actions 
was the statements that she gave to the police. Although the record shows a 
substantial amount of circumstantial evidence, New’s confession, standing 
alone, would have been sufficient for a rational jury to find that she 
intentionally or knowingly caused serious bodily injury to Kobe because she 
admitted, “I can see what I’m doing.” See Spang v. State, 781 
S.W.2d 713, 715 (Tex. App.—Austin 1989, no pet.) (holding that jury could 
reasonably conclude from appellant’s confession that he intended to cause 
serious bodily injury or that he was aware that his conduct was reasonably 
certain to cause such injury); see also Allen v. State, 478 S.W.2d 946, 
947 (Tex. Crim. App. 1972) (stating that knowledge and intent can be inferred 
from conduct of, remarks by, and circumstances surrounding acts engaged in by an 
accused). This statement alone reveals that New had knowledge of what she was 
doing and should have been aware of the potential for serious bodily injury 
where she was hitting or shaking Kobe with such force that his head repeatedly 
struck the floor. See Tex. Penal 
Code Ann. § 6.03(b).
        In 
addition, the modality of injury that New expressed in her confession (i.e., 
Kobe’s head hit the floor as she was shaking him) coincided with the medical 
evidence. For example, Dr. Wen and Dr. Swift testified that the force needed to 
cause Kobe’s fracture would amount to a substantial force ending in a blow 
against a hard object or surface, and Dr. Swift and Dr. Dolinak both testified 
that the injuries Kobe received are consistent with someone taking a child and 
slamming his head onto a hard surface, like the floor. Also, Detective Fite 
testified that the floor can be a deadly weapon. Moreover, the medical evidence 
ruled out the possibility that Kobe’s injuries could have been self-inflicted 
or caused by a child, and the evidence demonstrated that New was the only adult 
at home when Kobe’s injuries occurred. Furthermore, the bruises in various 
stages of development on Kobe’s body showed that the abuse was not an isolated 
incident and contributed to an inference of intent. Therefore, the jury could 
reasonably have inferred New’s intent from the extent of Kobe’s injuries. See 
Lindsey v. State, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) (stating 
that intent may also be inferred from extent of injuries and relative size and 
strength of parties), cert. denied, 416 U.S. 944 (1974); see also 
Davis v. State, 955 S.W.2d 340, 349 (Tex. App.—Fort Worth 1997, pet. 
ref’d) (stating that proof of culpable mental state generally relies on 
circumstantial evidence).
        The 
evidence also revealed consciousness of guilt on the part of New through her 
actions immediately following the commission of the crime. For instance, New 
remained unaffected emotionally and uninterested during most of the time that 
Kobe was being treated for his serious injuries, despite the fact that she was 
Kobe’s stepmother. Also, New told each person who questioned her a slightly 
different version of the events involving how Kobe was injured. By changing her 
story, the jury could have concluded that New lied because she had something to 
hide. See Couchman v. State, 3 S.W.3d 155, 163-64 (Tex. App.—Fort Worth 
1999, pet. ref’d).
        Thus, 
viewing the evidence in the light most favorable to the verdict, we hold that a 
rational trier of fact could have found the essential elements of the offense 
beyond a reasonable doubt. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Ross, 
133 S.W.3d at 620; see Dunn v. State, 13 S.W.3d 95, 98-99 (Tex. 
App.—Texarkana 2000, no pet.) (holding that evidence was legally and factually 
sufficient to support findings that defendant either acted with intent to cause 
serious bodily injury to child or knew that his actions were reasonably certain 
to cause that result where defendant’s mental state was proved 
circumstantially). Furthermore, viewing all the evidence in a neutral light, 
favoring neither party, we also conclude that the evidence supporting the 
verdict, taken alone, is not too weak to support the finding of guilt beyond a 
reasonable doubt and that the contrary evidence is not so strong that guilt 
cannot be proven beyond a reasonable doubt. Dotson v. State, 146 S.W.3d 
285, 295 (Tex. App.—Fort Worth 2004, no pet.); see Kemmerer v. State, 
113 S.W.3d 513, 515-16 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d) 
(holding evidence factually sufficient to show that appellant intentionally or 
knowingly caused bodily injury to child and stating that jury was free to 
believe State's evidence and to discount contrary evidence). Accordingly, we 
hold that the evidence is both legally and factually sufficient to support 
New’s conviction for intentionally or knowingly causing serious bodily injury 
to a child. We overrule New’s third issue.
V. Photograph 
Properly Admitted
        In 
her fourth issue, New contends that the trial court erred and abused its 
discretion by admitting photographs that were more prejudicial than probative. 
Specifically, New complains about a studio portrait of Kobe that was admitted by 
the State and displayed to the jury throughout final arguments. The State 
responds that the trial court did not abuse its discretion by admitting a 
photograph of Kobe before his death.
        The 
admissibility of a photograph is within the sound discretion of the trial judge. 
Williams v. State, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). The Texas 
Court of Criminal Appeals recently revised the policy for determining what 
photographs are admissible during criminal trials:
   
What we can glean from a thorough review of the relevant authorities is that a 
photograph must be relevant[;] thus, it must be helpful to the jury. Like 
other demonstrative evidence, photographs should assist the jury with its 
decision, whether that be deciding guilt or punishment. A photograph should add 
something that is relevant, legitimate, and logical to the testimony that 
accompanies it and that assists the jury in its decision-making duties. 
Sometimes this will, incidentally, include elements that are emotional and 
prejudicial. Our case law is clear on this point: If there are elements of a 
photograph that are genuinely helpful to the jury in making its decision, the 
photograph is inadmissible only if the emotional and prejudicial aspects 
substantially outweigh the helpful aspects.
 
Erazo 
v. State, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004). A court may 
consider the following factors in determining whether the probative value of any 
photograph is substantially outweighed by the danger of unfair prejudice: the 
number of photographs; the size of the photographs; whether the photographs are 
in color or black and white; the detail shown in the photographs; whether the 
photographs are gruesome; whether the body is naked or clothed; and whether the 
body has been altered since the crime that might enhance the gruesomeness of the 
photographs. Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000).
        The 
picture complained of in this case is helpful to the jury because it shows what 
Kobe looked like prior to his injuries, while the bulk of the testimony at trial 
focused on what Kobe looked like after his injuries. Thus, the photo assisted 
the jury in determining whether Kobe had any visible birth defects or diseases 
that would provide a different explanation for any of his injuries.      Additionally, 
only one photograph is at issue—an eleven-by-sixteen-inch color portrait of 
Kobe at age two. The portrait shows his physical features in explicit detail. 
Kobe was fully clothed; thus, the photograph is not gruesome. And, because the 
photograph was taken before Kobe’s death, it did not show his body as it 
looked after the crime. Consequently, the photograph was not more prejudicial 
than probative. See Gordon v. State, No. 05-02-00865-CR, 2003 WL 1494977, 
at *3 (Tex. App.—Dallas Mar. 25, 2003, pet. ref’d) (holding that photograph 
of victims taken before death was not excludable as prejudicial when it was 
relevant to prove their appearances before their deaths, allowed jury to have 
mental impression of victims, and was only photo offered depicting victims 
before death) (not designated for publication). Furthermore, Kobe’s birth 
mother identified the person in the photograph as Kobe, testified that he was 
about two when the photograph was taken, and explained that the photograph was a 
true and accurate depiction of what he looked like at age two; this testimony 
came in without objection. See Tanguma v. State, 721 S.W.2d 408, 413 
(Tex. App.—Corpus Christi 1986, pet. ref’d) (holding that there was no abuse 
of discretion by trial judge in admitting photograph of deceased before death 
when medical examiner’s verbal description of deceased’s appearance and 
build was admitted without objection).
        Moreover, 
to the extent that New complains that Kobe’s picture is more prejudicial than 
probative for the opposite reason—that Kobe’s picture is not gruesome but is 
too cute—we hold that the trial court did not abuse its discretion by 
admitting the picture. Kobe was the victim of the offense. The jury was entitled 
to know his identity, including his physical appearance, as a relevant fact in 
the case.
        Based 
on the analysis of the factors set forth above, we cannot say that the trial 
court abused its discretion by admitting a single studio portrait of Kobe taken 
before his death. Therefore, we overrule New’s fourth issue.
VI. Conclusion
        Having 
overruled each of New’s four issues, we affirm the trial court’s judgment.


                                                          SUE 
WALKER
                                                          JUSTICE
 
 
PANEL 
B:   HOLMAN, WALKER, and MCCOY, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
February 3, 2005









APPENDIX
 
        The 
following includes examples of the questions raised by New’s counsel during 
voir dire pertaining to the death of the child:
 
  

Now, we haven’t discussed the facts in this case, and as the Judge said, I’m 
not allowed to, and I’m not going to. And we all know that cases involving 
child abuse can run a gamut of different types of abuse. There can be purely 
mental abuse where there’s no physical contact whatsoever, and it can run the 
entire gamut to physical abuse of very slight bruising to, as the court has 
talked about, serious bodily injury--and I’m going to talk about that in just 
a minute--all the way up to and including death of a child, okay?
   
Now, my question to you is, if knowing that this case involves injury to a 
child, does it change anyone’s thought or perception about . . . this case, 
understanding that the range of this case and facts of this case could go 
anywhere from just no physical contact and maybe mental abuse all the way up to 
and including death of the child?
   
And am I making myself clear? I’m getting a lot of puzzled looks here. Do 
y’all understand my question? Okay. So if allegations of injury were, you 
know, just merely physical, you know, slight bruising or something like that, 
you could sit objectively, listen to this case the same as if it went all the 
way up to and including death of a child? That would not change anybody’s 
perception?
 
                . 
. . .
 
We 
were talking about a potential range of evidence in this case which could go 
anywhere from, like I said, a case of mental abuse where there’s no physical 
conduct all the way up to severe physical abuse, all the way up to and including 
death of the child. Okay. I take it by your silence, then, that irregardless of 
what range could be alleged by the State that you could fairly and impartially 
sit and listen to the evidence, and that that range would not affect you other 
than to weigh the evidence fairly and impartially.
  
Okay. Thank you.
 
                . 
. . .
 
All 
right. Now, previously I had asked you about--we talked about the fact that 
child abuse cases can run a complete gamut in the case. And as the State has 
told you earlier, the range of punishment in this case could be anywhere from 
five years’ probation, or if it were--if the case were proven in a different 
fashion, go down to a state jail felony, which would be five year’s probation 
also--yeah, five years’ probation all the way up to 99 or life. Okay.
   
And I guess my question--follow me close here because I want to make sure 
everybody understands what I’m asking here.
  
My question is, could you consider the entire range of punishment, be it five 
years’ probation or all the way up to life irregardless of the type of case? 
By that I mean whether it be slight abuse or all the way up to and including 
death of the child. Okay. Everybody understand my question? Okay.
 
                . 
. . .
  

Does 
everybody understand my question here? There’s an entire range of criminal 
activity here that could be considered injury to a child and involve multiple 
types of intent and multiple types of bodily injury. And serious bodily injury 
can go anywhere from a minor impairment all the way up to a severe, extreme 
impairment, broken bones, whatever, all the way up to and including death. What 
I’m asking y’all, if you can find the full range of criminal activity, can 
you still apply the full range of punishment in this case?
 
                . 
. . .
 
So 
if it included the death of the child, you would still consider probation, 
right, not just murder?
 
                . 
. . .
 
If 
the State were to prove--and you understand that the definition of serious 
bodily injury can include a substantial risk of death, serious permanent 
disfigurement, and up to and including death of a child?
 
                . 
. . .
 
If 
they were to prove that intent, would you automatically chop off the low end of 
the punishment?


NOTES
1.  
New’s counsel explained that had an additional peremptory challenge been 
granted and had Mr. Wilson been excused, he “would have selected and struck 
Mr. Shivers, and number 49, or Mr. Smith, or juror number 7, Ms. Spalding in 
this case . . . for the reasons that they had expressed, that they were involved 
with the State.” He also requested additional peremptory challenges after 
making this statement, and the trial court denied his request.
2.  
New argues that she was not able to ask the venire panel about the death of the 
victim; she contends that the venire members brought up the issue on their own.
3.  
In determining whether the trial court abused its discretion by denying a 
challenge for cause, we first consider whether New preserved error by 
demonstrating that (1) she exhausted all of her peremptory challenges, (2) the 
trial court denied her request for additional peremptory challenges, and (3) an 
objectionable venireperson upon whom she would have exercised a peremptory 
challenge was seated on the jury.  See Coble v. State, 871 
S.W.2d 192, 201 (Tex. Crim. App. 1993), cert. denied, 513 U.S. 829 
(1994).  The record demonstrates that New followed the steps to preserve 
any potential error, so we proceed with determining whether the venire members 
of whom she complains were biased and challengeable for cause.
4.  
Although New only asks this court to reverse her conviction, she addresses both 
legal and factual sufficiency.  Because legal insufficiency results in an 
acquittal, we will address both legal and factual sufficiency.
5.  
Although he could not testify to the handling of the body during transport to 
his office, Dr. Dolinak said that postmortem bruising “would be pretty 
rare.”
6.  
Detective Mayfield knew that Kobe had a head injury and had been transported to 
Children’s Medical Center.
7.  
Detective Fite’s testimony is set forth below.